A96A2123. HAMMOND v. CITY OF WARNER ROBINS.
(482 SE2d 422)

ELDRIDGE, Judge.

Appellant brought an action against the City of Warner Robins in nuisance, trespass, and inverse condemnation. From 1972 until 1976, Warner Robins operated a sanitary landfill.

There exists a three-foot layer of soil as a ground covering for the landfill; beneath this layer, household garbage exists from a depth of three feet to thirty feet.

Most sanitary landfills contain organic waste, such as household garbage, which decays with time. The rate of decay varies with time at a rate which can be represented by a bell curve. However, since there exists no uniformity in content of the landfill or time and depth of a waste deposit, then there exist multiple rates of decay which would be represented by overlapping bell curves for each layer of waste. Anaerobic decay, in the absence of air, produces methane gas and water.

Methane gas is an odorless, colorless, organic compound that is lighter than air so that it has a tendency to migrate to an environment where it will be under less pressure. If ventilated vertically to the ground surface, methane gas will dissipate into the atmosphere. Methane seeks the course of least resistance through the soil; it will migrate vertically through decaying waste if there exists no clay cap as a barrier or will migrate laterally under normal conditions, depending upon the geological composition of the soil. Methane generation or water saturation can increase the pressure buildup that, along with an impervious soil condition, such as clay, can cause a downward and lateral movement of the gas along porous soil. Methane gas will collect in voids in the soil, cracks in rocks, or areas beneath structures, such as crawl spaces. When the ground surface dries out and cracks, methane gas can seep out of the ground through such opening. The gas can move laterally through gravel, silt, sand, and geological faults, seeking to escape to the atmosphere. This means that methane can move along and above groundwater tables, because the soil is porous enough to allow water collection and flow; during droughts, when the water level falls, these voids become empty, allowing the invasion of methane gas. When methane gas concentrations reach five percentage or greater, which is 50,000 ppm, the gas becomes explosive if ignited. At higher concentrations, it can be harmful to human health; often vegetation near escaping methane gas dies.

Landfills often contain other organic chemicals, such as cleaning fluids, paint, paint remover, and industrial solvents, which may settle into ground water or decompose into organic gases. Many of these organic compounds are either toxic to tissue, carcinogenic, or both.

Springwood Subdivision was built next to the landfill after it closed in 1976. Some lots abutted the east boundary line of the landfill, which exists at a higher elevation than the subdivision. Since the landfill sits at a higher elevation and extends to a depth of 30 feet, the bottom of the landfill lies close to the level of the ground water table in the subdivision.

Appellant bought her house in the subdivision at 102 Prado Court in 1985 for $80,000. Prado Court lies parallel to the east side of the landfill, approximately 150 feet away from the landfill. Appellant's property is approximately 175 feet east of the landfill across Prado Court. Mr. Holt's property, 103 Prado Court, lies between Prado Court and the landfill, across from appellant.[1]

---

[1] Mr. Holt's property was the subject of a similar suit, *City of Warner Robins v. Holt*, 220 Ga. App. 794 (470 SE2d 238) (1996).

Appellant lived in the house at 102 Prado Court for approximately one year prior to her marriage, when she moved out. She has leased out the property ever since. In 1988, appellant sought to refinance the property loan, but the lender declined to make the loan because of the risk of methane gas. From this loan rejection, appellant first learned of the potential methane problem. Since then, she has been unable to sell the property. While refinancing has been a problem, a factual dispute exists as to whether the property can be refinanced or not.

Methane gas was detected at 103 Prado Court (Mr. Holt's property) by the Georgia Department of Natural Resources, Environmental Protection Division, but the gas was not found at 102 Prado Court. Tests conducted by engineers retained by the city have been unable to find methane gas on appellant's property, but the test hole went only to a depth of two and one-half feet.

After testing, the City of Warner Robins engaged in a methane gas abatement program along Prado Court and Springwood Drive; a drainage swale was constructed with a 12-foot trench at the bottom filled with clay to form a passive barrier; methane gas vents to a depth of 15 feet were installed and a line of gas monitor holes were dug along Prado Court to the same depth.

Appellant joined with three other litigants in the subdivision to pay $16,000 for deep test wells to be drilled at 103 Prado Court, Mr. Holt's property, below the ground water table. Such wells went five feet below the water table, to a depth of between 35 and 40 feet. Tests at these depths showed high concentrations of methane gas where the soil was either moist silt or very moist sand that provided a good porous soil condition for lateral migration. The test well at MW-3 was approximately 130 feet from 102 Prado Court and was the closest well to this address. The report showed test results in methane gas present in parts per million (ppm): no gas present at 5 and 10 feet; 4 ppm at 15 feet; 8,990 ppm at 20 feet; and more than 10,000 ppm at 25 through 35 feet. The water table was determined to lie at MW-1 at 36.86 feet; at MW-2 at 33.53 feet; at MW-3 at 29.47 feet; and at MW-4 at 32.67 feet.

Appellant's expert, Dr. Ronald Huggins, interpreted the test results to show that methane gas had migrated from the landfill through the porous zone of soil at and above the water table in high concentrations. In Dr. Huggins' opinion, the methane gas migrated beyond the test wells along the course of least resistance and under appellant's property. The existence of high concentrations of methane gas presented not only a physical hazard but also a potential health hazard, although Dr. Huggins admitted on cross-examination that the levels of methane found at 102 Prado Court in June 1994 were not physically dangerous at that time, but its presence posed a

health risk. He also opined that the testing methodology employed by Warner Robins' experts was deficient in that it did not drill deep enough, and that the passive barrier, methane vents, and monitor holes at a depth of 15 feet or less allowed methane gas to migrate underneath these installations without detection. He concluded that the methane gas came from the landfill.

Appellee's expert, Mr. Hodges, stated in contradiction that, in his opinion, the methane gas detected at 103 Prado Court was either caused by construction debris from the subdivision or by the decay of such materials providing a pathway for methane gas to migrate from the landfill. In his opinion, it would be highly improbable that methane gas could migrate from the landfill to 102 Prado Court. Mr. Hodges also had a problem with the methodology used by Dr. Huggins. However, the only test done on appellant's property by appellee's experts was at a depth of two and one-half feet.

During May and June of 1994, appellant and the three other litigants spent another $16,000 to actually drill test wells on their own property to provide direct evidence of the subsoil presence of methane gas from the landfill. The test wells at OW-2 and OW-4 were on the north and south property lines of 102 Prado Court, appellant's property.

The June 30, 1994 test report showed methane gas concentrations (in parts per million) at the test depths:

| Depth in feet | OW-2 | Soil Type | OW-4 | Soil Type |
|---|---|---|---|---|
| 3 to 5 | 10 ppm | clay | 9.5 ppm | clay |
| 8 to 10 | 15 ppm | silt | 25 ppm | silt |
| 13 to 15 | 18 ppm | silt | 12 ppm | silt |
| 18 to 20 | 8 ppm | silt | 12 ppm | silt |
| 20 to 25 | 95 ppm | moist silt | 13 ppm | silt |
| 28 to 30 | 40 ppm | very moist | 12 ppm | moist silt |
| 33 to 35 | N/A | sand | 26 ppm | moist silt |
| 38 to 40 | N/A | | 15 ppm | very moist clay |

In addition, measurable amounts of other organic gases were found, including: dichlorodifluoromethane; tetrachloroethane; tridecane; chloroform; methylene chloride; eicosane, 10-methyl-; and styrene.

Appellant's real estate appraiser gave an appraisal that the property had an $82,000 fair market value, but that it should be discounted 40 percent to reflect the effect of contamination on the market price, so that the actual fair market value was $48,840. Appellee's real estate expert agreed as to the fair market value without the discount, and questioned the use of the 40 percent figure.

The trial court denied appellee's initial motion for summary judgment; upon the renewed motion for summary judgment before a senior judge, the motion was granted.

1. Appellant's first enumeration of error is that the trial court erred in finding that a physical invasion and physical damage were necessary to support a claim of nuisance.

Appellee's expert witnesses testified that methane gas and other organic compounds were stopped by the passive clay barrier on 103 Prado Court, and that, because of such barriers, it was highly improbable that methane gas could migrate from the landfill underground across 103 Prado Court (Mr. Holt's property), cross Prado Court, which was built upon a clay base, and invade appellant's property at 102 Prado Court.

However, appellant's expert dug deep test wells below the water table on 103 Prado Court and found methane gas in the porous layer of soil above the water table at a depth of 20 to 30 feet. He testified that, in his opinion, methane gas would continue to migrate the additional approximate distance of 175 feet to appellant's property by passing under the passive barrier which extended to only a depth of 15 feet.

In May and June of 1994, when test wells were finally drilled at 102 Prado Court (appellant's property) at a depth of 20 to 30 feet, it was found that methane gas, as well as other organic gases, had, in fact, invaded appellant's property and were detectable between both the north and south property lines above the water table. This meant that such gases had invaded the entire property through the porous area or zone extending upward through the silty soil layer. In fact, trace amounts were detectable in the clay three to five feet below the surface of the ground.

While each of the opposing party's experts challenge the methodology and test results of the other and question the extent of damages resulting from such invasion of methane and other organic gases from the landfill, such conflicts not only raise material issues of fact, but also raise issues of weight and credibility of the evidence and expert opinions.

The legal issue presented is whether the subsurface contamination of soil with methane gas or organic man-made compounds in trace amounts constitutes a nuisance upon which an action for damages can be based. " ' "Under some factual situations, it can be held as a matter of law that no nuisance exists; however, that question ordinarily is a question for the jury." (Cits.)' [Cit.]" *Grier v. City of Atlanta*, 200 Ga. App. 575, 576 (408 SE2d 794) (1991), citing *Whiddon v. O'Neal*, 171 Ga. App. 636, 638 (320 SE2d 601) (1984).

This Court, on almost identical facts, has already found that a jury issue of permanent nuisance and damages arises. *City of Warner Robins v. Holt*, 220 Ga. App. 794 (470 SE2d 238) (1996). In *Holt*, the property involved was 103 Prado Court, which lies directly across the street from appellant's property and had the nearest test well

approximately 130 feet away; the test levels of methane were higher and the property abutted the landfill in *Holt*; and the expert witness for the plaintiff in *Holt* is also appellant's expert. Therefore, the differences between the two cases lie in the level of methane and other organic gas invasion, and not on the question of whether or not subsurface contamination can give rise to a nuisance, because *Holt* held that "the evidence presented a jury issue concerning whether there was a nuisance, and, if so, whether it was permanent or abatable." Id.

The evidence shows the ability of methane and other gases to migrate from the landfill, despite abatement efforts, across the Holt property and the street to physically invade appellant's property; the measurements of the methane and other gases on appellant's property have varied with time and location; the expert testimony shows that the output of methane gas by the landfill can increase, which could also cause the levels of measurable methane gas on appellant's property to increase and which could increase to safety hazard levels. Whether or not the methane gas will increase or could increase to safety hazard levels in the foreseeable future are questions for jury determination based upon expert testimony. If a jury determines that the physical invasion of methane gas is de minimis or is unlikely to increase in the future, then the jury would determine what actual effect that level of methane would have on the fair market value of the property; however, if the methane level at the time of trial has substantially increased or is found by the jury to have a future likelihood of increasing, then the jury would determine what effect that level of methane would have on the fair market value. At trial, the jury must determine whether the nuisance is permanent or abatable. In light of *Holt*, it appears highly unlikely that the methane and other gas can be abated because of the passage of time since the prior abatement efforts were undertaken and the subsequent methane levels on appellant's property, but the determination of whether the nuisance is permanent or abatable would be a matter for the jury to decide. "What constitutes the proper measure of damages recoverable by the owner of real property damaged by a nuisance turns upon the issue of whether the nuisance is permanent or abatable. If the nuisance is permanent, the measure of damages is the diminution of fair market value of the property. If the nuisance is abatable, the measure of damages is the lost rental value for so long as the nuisance is allowed to continue." *Holt,* supra at 796. Under OCGA § 41-1-3 or § 41-1-4, if an individual has "special damages," then the individual has a right of action. If a nuisance is found to exist although there has been only de minimis damage to the property interest, appellant may seek damages for "annoyance and discomfort" caused by such nuisance as a result of the maintenance of the nuisance. *Shepherd Constr. Co. v. Vaughn,* 88 Ga. App. 285, 291-292 (5) (76

SE2d 647) (1953); *Sam Finley Incorporated v. Russell*, 75 Ga. App. 112, 118 (3) (42 SE2d 452) (1947); see also *Central Ga. Power Co. v. Parker*, 141 Ga. 198 (80 SE 648) (1913); *Swift v. Broyles*, 115 Ga. 885 (42 SE 277) (1902). Damages for discomfort and annoyance are separate and distinct damages from any damage to realty. *City of Atlanta v. Murphy*, 194 Ga. App. 652 (391 SE2d 474) (1990). The measure of damages for discomfort, unhappiness, and annoyance is in the enlightened conscience of the jury. *Holt*, supra at 797-798 (3), (4).

Stigma to realty, in and of itself, is too remote and speculative to be a damage and is of first impression; the closest area in tort comes under OCGA § 51-9-11, slander to title, which is analogous to a stigma. A stigma may arise when there exists a minimal physical invasion through nuisance, which would not rise to the level of actual hazard to health or safety, and which cannot be abated or which abated has a negative effect on the property in public perception, i.e., there is a demonstrable effect on the fair market value. Special damages proximately flowing from such nuisance must be shown. See *Copeland v. Carpenter*, 203 Ga. 18, 19 (1) (45 SE2d 197) (1947); *Schoen v. Maryland Cas. Co.*, 147 Ga. 151, 153 (93 SE 82) (1917); *Daniels v. Johnson*, 191 Ga. App. 70, 73 (2) (381 SE2d 87) (1989). Inability to obtain loans or refinancing the realty does not constitute a special damage. *Hicks v. McLain's Bldg. Materials*, 209 Ga. App. 191, 192 (1) (433 SE2d 114) (1993); *Harmon v. Cunard*, 190 Ga. App. 19, 20 (378 SE2d 351) (1989). Costs of litigation including attorney fees do not constitute special damages. *Hicks*, supra at 192. In *Harmon*, supra, appellant alleged "that the lien prevented her from obtaining funds necessary to complete her house and prevented her from selling her house, without offering specific figures for the damage allegedly suffered." Id. at 20. In the case sub judice, the appellant has produced some evidence as to the value before the nuisance was discovered as well as some opinion evidence as to the value after the nuisance was discovered, which would provide the measure of damages for the jury to determine damages, if any. Thus, even if at trial appellant fails to be able to prove anything more than nominal damages to her realty interests, she has a right to seek the above damages from a jury.

The Supreme Court has disapproved the holding in *Austin v. Augusta Terminal R. Co.*, 108 Ga. 671 (34 SE 852) (1899), defining the nature of a property interest too narrowly. *Duffield v. DeKalb County*, 242 Ga. 432, 433-434 (249 SE2d 235) (1978). *Austin v. Augusta Terminal R. Co.*, supra, even in its narrow definition of real property interests, stands for the fundamental proposition that any repeated and continuous physical invasion of the real property of another constitutes a private nuisance; a physical invasion has occurred in the case sub judice, as well, yet the trial court has

granted summary judgment. In *Duffield,* supra, the Supreme Court held that "[t]he term (property) comprehends not only the thing possessed, but also, . . . *means the rights of the owner in relation to land* or a thing; *the right of a person to possess, use, enjoy and dispose of it.* . . . Therefore, no physical invasion damaging property need be shown, only an unlawful interference with the right of the owner to enjoy his possession." Id. at 433-434. A municipality, unlike a county, can be held liable for a private nuisance, whether it arises from a governmental or ministerial function which damages property (*City of Rome v. Turk,* 235 Ga. 223 (219 SE2d 97) (1975)) or which causes health hazards (*Kea v. City of Dublin,* 145 Ga. 511 (89 SE 484) (1916); *Ingram v. City of Acworth,* 90 Ga. App. 719 (84 SE2d 99) (1954)). *Duffield,* supra at 434, n. 2.

In the case sub judice, a physical invasion of appellant's property has occurred even though it may be 23 feet below ground; it cannot be said as a matter of law that this caused no damages, which would be for jury determination. Where a governmental entity causes damage to property in carrying out a governmental function, such invasion of an individual's property interest would not only be a private nuisance but would also be an inverse condemnation of the property, either permanently or temporarily. *Duffield,* supra at 432-434.

While it appears unfair for a municipality to be liable to subsequent adjacent property owners for any pre-existing nuisance to their acquiring the property, the nuisance is a continuing tort, which injures them anew each day of its existence, and to the extent that it is a damage to property interests, such would be a chose in action, assignable, which would pass to successors in title. OCGA §§ 44-12-20; 44-12-22; 44-12-24; *McLanahan v. Keith,* 135 Ga. App. 117, 119 (2) (217 SE2d 420) (1975). Under the facts of both *Duffield,* supra, and *Holt,* supra, the nuisance preceded the ownership of each property owner.

In the case sub judice, the gas is trapped into the very body of the property and is not merely moving across the surface of the property, based upon the direction of the wind, so that it is a physical invasion of the property, so that a finding of a partial condemnation is not a condition precedent to recovery, although appellant does, in fact, contend that there has been such taking by inverse condemnation. In *Hoffman v. Atlanta Gas Light Co.,* 206 Ga. App. 727, 730 (426 SE2d 387) (1992), this Court held that "[t]he 'damages growing out of (the) nuisance' . . . [is] the continuing 'hurt, inconvenience, or damage' caused by the hydrocarbon contamination, for which OCGA § 41-1-1 gives a cause of action . . .," and treated the contamination as a physical invasion of the property. Here, the hydrocarbon was a gas instead of a liquid, which nonetheless has contaminated the soil within which it is trapped and continues to infiltrate.

On motion for summary judgment, the burden is on the movant to establish the absence of an element of plaintiff's claim, and to show that the evidence, viewed most favorably to the non-movant, warrants judgment as a matter of law. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). In the case sub judice, there is conflicting evidence regarding the elements of a nuisance, and summary judgment should be denied.

Further, opinion evidence in opposition to a motion for summary judgment can be sufficient to preclude a grant of summary judgment. *Barlow v. Orkin Exterminating Co.*, 196 Ga. App. 822, 823 (397 SE2d 170) (1990), citing *Brygider v. Atkinson*, 192 Ga. App. 424, 426 (385 SE2d 95) (1989); see also *Davidson Mineral Properties v. Gifford-Hill & Co.*, 235 Ga. 176, 177 (219 SE2d 133) (1975). In the case sub judice, the expert opinion evidence conflicts not only as to the existence of a nuisance, but also as to damages. When movant's expert opinion has been contradicted, summary judgment should be denied. *Haire v. City of Macon*, 200 Ga. App. 744 (409 SE2d 670) (1991).

The trial court erred in the grant of summary judgment on the issue of the existence of a nuisance under the facts of this case.

2. The second enumeration of error is that the trial court erred in dismissing the appellant's claim for inverse condemnation. Where there has been a physical invasion, either temporarily or continuously, of the property of a person by a governmental entity that causes damage, such invasion of the property rights may give rise to inverse condemnation where no compensation has first been paid for such governmental damage. *Duffield v. DeKalb County*, supra; *Fulton County v. Baranan*, 240 Ga. 837 (242 SE2d 617) (1978). Generally, such physical invasion is either in the form of solids or liquids, but may also be in the form of gases. The physical property of gases is such that, if not confined, gases diffuse in all directions to equalize pressure; gases that are lighter than air will rapidly dissipate or move upward into the atmosphere, but gases that are heavier than air will pool on the surface and slowly diffuse laterally like water. Gases that are lighter than air may cause danger by being noxious in odor, explosive, corrosive, or toxic, causing damage depending on whether they are transitory or a continuous physical invasion; such gases are subject to wind and rain, which may accelerate or delay the movement of the gas over the property. In contrast, gases that are heavier than air will move like a liquid at or above the surface of the ground until the gas has diffused or been blown away by wind or rain. It is in recognition of that fact that odor or smoke, as well as more harmful gases, may, depending upon the facts and circumstances, constitute a public taking through inverse condemnation. See *Duffield,* supra. The constitution "does not, however, give these authorities the power to damage property without a taking. The

'damage' clause gives the injured citizen a constitutional cause of action against a public authority for injury to his property interests regardless of whether there is also a 'taking.'" *MARTA v. Trussell*, 247 Ga. 148, 149 (1) (273 SE2d 859) (1981). Where private property has been damaged negligently for public purposes, under the constitutional provisions for eminent domain the property owner can recover for such damages. *Woodside v. Fulton County*, 223 Ga. 316 (155 SE2d 404) (1967).

In the case sub judice, there is not a surface presence of gases which are moving across the surface of the property but an actual subsurface invasion of appellant's property, so that the gases diffuse throughout the soil and become trapped in any faults, voids, or fissures in the property. Under such circumstances, the trapped gases present a physical invasion which is similar to a solid or liquid. The nature and extent of damage presents a factual question for jury determination. See *Holt*, supra at 796 (2). A party is entitled to one complete recovery for their damages; therefore, if the appellant recovers for a temporary or permanent nuisance, then there could be no additional recovery under the theory of inverse condemnation; conversely, if there is a full recovery under the theory of inverse condemnation, then there can be no recovery for nuisance. Since the permitted damages under nuisance are broader, then there can be no recovery under both theories for the same damages, but could be a recovery under each theory for different damages.

For the reasons set forth not only in Division 1 but also herein, the trial court erred in dismissing the claim or in granting summary judgment.

*Judgment reversed. McMurray, P. J., Birdsong, P. J., Pope P. J., Johnson and Smith, JJ., concur. Andrews, C. J., and Ruffin, J., concur in the judgment only. Beasley, J., dissents.*

BEASLEY, Judge, dissenting.

"A nuisance is anything that causes hurt, inconvenience, or damage to another, and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man." OCGA § 41-1-1. We have recognized that "[t]he classic definition of a private nuisance is such conduct as constitutes an unreasonable interference with the plaintiff's interest in the use and enjoyment of his land." *Barrow v. Ga. &c. Aggregate Co.*, 103 Ga. App. 704, 711 (4) (120 SE2d 636) (1961), disapproved as to another proposition, *OB-GYN Assoc. &c. v. Littleton*, 259 Ga. 663, 667 (B) (386 SE2d 146) (1989). See also Prosser & Keeton, The Law of Torts, "Nuisance," § 87, pp. 619, 622; Restatement of the Law, Torts 2d, § 821D.

In construing this Code provision, which is not intended to change the common-law definition of nuisance,[2] the Supreme Court has held that in order to constitute a nuisance, "there must be the *maintenance* of a dangerous condition on a *continuous* or *regular* basis over a period of time in which no action or inadequate action is taken to correct the condition after knowledge thereof." (Emphasis in original.) *City of Bowman v. Gunnells*, 243 Ga. 809, 810 (1) (256 SE2d 782) (1979). Although the Supreme Court in that case recognized that whether a complained-of condition constitutes a nuisance is ordinarily a question of fact, "under some factual situations it can be held as a matter of law that no nuisance exists." Id. at 811. *Gunnells* was one of those situations, and Mrs. Hammond's case is another. The superior court did not err in granting summary judgment to the municipality on her second restated amended complaint, as asserted on appeal.

The city landfill and the emanating methane gas which Mrs. Hammond alleges interfered with her right to use and enjoyment of her property were involved in the suit of her neighbor Holt. His house was adjacent to the landfill and there was evidence his property contained dangerous levels of methane gas from the landfill, rendering it uninhabitable or, if corrected, then unmarketable; the jury's finding of a permanent nuisance was thus upheld. *City of Warner Robins v. Holt*, 220 Ga. App. 794 (470 SE2d 238) (1996). Mrs. Hammond's house, located diagonally across the street from Holt's, was not uninhabitable and actually was rented for the entire time in issue here, with somewhat escalating rent. Her case is not founded on "almost identical facts" as that of Mr. Holt, contrary to the majority's analysis.

Mrs. Hammond encountered difficulty in refinancing the house in 1988. The lender refused because of the methane problems with the neighbors' houses and the inability of the city engineer to guarantee that there would be no methane on Mrs. Hammond's property for the life of the proposed loan, 15 years. No methane gas had been detected on her property at that time, and no methane gas has been detected despite various tests and periodic testing since that time, except for a small amount found once deep down by her expert in 1994. No subsequent test measured any. The amount found, 95 parts per million, is over 500 times below the lowest risk level of combustion, which is the only danger methane gas poses. The *lowest* level at which the gas will support combustion is approximately 50,000 parts per million. Except for its combustibility, methane gas poses no risk to health or safety and is not otherwise offensive, because it is

---

[2] *Hill v. McBurney Oil &c. Co.*, 112 Ga. 788, 793 (38 SE 42) (1901).

odorless, colorless, and nontoxic, which Mrs. Hammond admits.

Moreover, "[a] single isolated occurrence or act, which if regularly repeated would constitute a nuisance, is not a nuisance until it is regularly repeated. [Cit.] . . . Assuming for the sake of argument that the evidence showed that this [single] occurrence was due to the negligence of the defendant in this case, it was wholly insufficient to authorize any finding that the defendant was creating or maintaining a nuisance so as to authorize the abatement thereof. . . ." *Southeastern Liquid Fertilizer Co. v. Chapman*, 103 Ga. App. 773, 775-776 (2) (120 SE2d 651) (1961). See *Desprint Svcs. v. DeKalb County*, 188 Ga. App. 218, 220 (2) (372 SE2d 488) (1988); compare *DeKalb County v. Orwig*, 261 Ga. 137, 138-139 (2) (402 SE2d 513) (1991).

The difficulties Mrs. Hammond experienced in refinancing her property, which she ultimately did refinance, despite the one instance of measured methane, were attributed not to the presence of the small amount on her property. That information was not conveyed to any lender and was obtained in June 1994, long after her 1988 initial efforts at refinancing. Nor was it conveyed to any renter or proposed renter, so the presence of a minuscule amount of methane gas many feet below the surface, detected once, did not affect marketability as either sale or rental property. Instead, the difficulties were founded on the perception that the property was worth less because of the methane problems of other nearby property owners and the lack of a guaranteed forecast.

The landfill itself cannot be a nuisance. It had been operated in years prior to 1977, when it was closed, and the residential subdivision in which Mrs. Hammond's house is located was built thereafter.[3] "[T]hose owning property in the vicinity of a public work, whose property values are depreciated thereby, are not entitled to compensation under the state constitutional provision that private property shall not be taken or damaged for public use without just compensation." *Evans v. Just Open Government*, 242 Ga. 834, 837 (251 SE2d 546) (1979).[4] In *Evans*, the plaintiffs alleged nuisance per se and nuisance per accidens. Id. at 836. But the Court relied on earlier authority in holding that the prisons at issue are a public necessity, are authorized by law, and thus are in no legal sense a nuisance. Id. at 839 (4). The same must be said of a public landfill. Moreover, the value of Mrs. Hammond's property was established when the landfill was already in existence and closed. Of course, as recognized in *Evans*, the manner in which the facility is kept might become a nuisance.

Here, then, the question is whether the migration of methane

---

[3] "Coming to a nuisance" does not necessarily preclude recovery. See Prosser & Keeton, The Law of Torts, "Nuisance," pp. 634-636.

[4] Present Constitution, Art. I, Sec. III, Par. I.

gas onto others' property, which Mrs. Hammond's evidence tends to show affected the value of hers insofar as its refinancing and possibly its sale are concerned, can constitute a nuisance on her property right to enjoy her property. As held in *Duffield v. DeKalb County*, 242 Ga. 432, 433-434 (249 SE2d 235) (1978), where the property owners also claimed nuisance and inverse condemnation, "property" comprehends the thing possessed as well as the rights of the owner in relation to it; "the *right of a person to possess, use, enjoy and dispose of it, and the corresponding right to exclude others* from the use. [Cit.]" (Punctuation omitted.) There need not be a "physical invasion" damaging to the property; a nuisance may also be constituted of only "an unlawful interference with the right of the owner to enjoy his possession." Id. at 434.

Here there was no health or safety nuisance connected to plaintiff's property; there is only a claimed economic nuisance engendered by methane gas in such levels on other property such as Holt's, and by the inability of defendant municipality to assure no future gas on Mrs. Hammond's property. This cannot constitute an unlawful interference with Mrs. Hammond's enjoyment of her property so as to constitute the maintenance of a nuisance by the municipality as to her. A problem on adjacent property, tending to devalue the plaintiff's property, is not such inconvenience as to amount to a nuisance. *Jillson v. Barton*, 139 Ga. App. 767, 769 (1) (229 SE2d 476) (1976). Mere diminution in property value as a result of adjacent or nearby contamination, in and of itself, does not constitute an actionable nuisance because the creation of such losses is not a substantial and unreasonable interference by the municipality with the use and enjoyment of property. The contamination of the neighbors' property did not spill over to constitute a nuisance on plaintiff's property by way of the effect of the former on the market perception of the value of her property. It is damnum absque injuria, a loss without legal injury.

Other courts have referred to what Mrs. Hammond claims as injury as "stigma" and have refused compensation. See, e.g., *In re Paoli R. Yard PCB Litigation*, 811 FSupp. 1071, 1074 (E.D. Pa. 1992); *Adkins v. Thomas Solvent Co.*, 487 NW2d 715 (Mich. 1992); *City of Newport v. Emery*, 559 SW2d 707 (Ark. 1977).

Anticipating a potential future nuisance is non-actionable because it requires a conclusion not based on existing facts. *Kahn v. Standard Oil Co.*, 165 Ga. 575 (141 SE 643) (1928). "The whole idea of *nuisance* is that of either a continuous or regularly repetitious act or condition which causes the hurt, inconvenience or injury. To this end, it has long been recognized in Georgia that the mere apprehension of future injury from a nuisance which the complainant anticipates may be maintained in the future in the operation of a lawful

business is not sufficient to authorize its abatement. If it be a nuisance, the consequences must be to a reasonable degree certain. [Cits.]" *Chapman*, supra at 775 (2).

Since plaintiff has no claim against the municipality for nuisance, even giving her the benefit of all evidence in her favor as must be done on summary judgment, she cannot recover on the theory of inverse condemnation either. Without the nuisance, there is no taking for which plaintiff would be entitled to compensation. See Prosser & Keeton, The Law of Torts, "Immunities," p. 1054, § 131; *Duffield*, supra; *Evans*, supra. Diminution of value in and of itself does not constitute a constitutional deprivation of property rights so as to amount to a taking for which compensation is required. *Gradous v. Bd. of Commrs. &c.*, 256 Ga. 469, 471 (349 SE2d 707) (1986). As a matter of law, no compensable taking of Mrs. Hammond's property rights occurred. As to this being a question of law, see *MARTA v. Fountain*, 256 Ga. 732, 734 (352 SE2d 781) (1987).

The trial court's grant of summary judgment to the City of Warner Robins should be affirmed.

DECIDED FEBRUARY 17, 1997 — 

*Decker & Hallman, F. Edwin Hallman, Jr., David C. Moss, Pamela M. Richards-Greenway*, for appellant.

*Jones, Cork & Miller, Hubert C. Lovein, Jr., Robert C. Norman, Jr.*, for appellee.

*Kilpatrick & Cody, Edward A. Kazmarek, Troutman Sanders, John H. Johnson, Jr., Hollister A. Hill, Walter E. Sumner, Susan M. Pruett, James F. Grubiak*, amici curiae.