**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 27, 2013**

# In the Court of Appeals of Georgia

A13A0729. J. N. LEGACY GROUP, INC. v. CITY OF DALLAS, GEORGIA.

McMillian, Judge.

J. N. Legacy Group, Inc. ("J. N.") appeals the trial court's grant of summary judgment in favor of the City of Dallas, Georgia (the "City") on J. N.'s claims for nuisance and violation of ministerial duties in failing to maintain the public sanitary sewer system that serves J. N.'s property. For the reasons set forth below, we affirm the trial court's grant of summary judgment on J. N.'s claim of a violation of ministerial duties and reverse the grant of summary judgment as to its nuisance claim.[1] Additionally, we affirm in part and reverse in part the trial court's order

___

[1] J. N. later amended its complaint to add a claim for breach of contract. The trial court's order granting summary judgment on all of J. N.'s claims necessarily included that contract claim. Because J. N. does not appeal that portion of trial court's summary judgment order, however, we do not address that claim on appeal.

granting partial summary judgment with regard to J. N.'s damage claim seeking the cost of mold remediation.

J. N. is an investment group founded by three siblings, David L. Butler, Jeff Butler and Patti Pruitt (sometimes referred to herein as the "Butler siblings"), which acquired the property at 2025 Marshall Huff Road in Dallas, Georgia (the "Property") in 1999. The Property contains a 5,000-square-foot building with a metal roof, metal walls and a cement floor (the "Building"). The majority of the Building was used as a warehouse or work area, with a small portion used for an office. At the pertinent time, the walls and ceiling of the office space were finished with sheetrock, and the floor was carpeted.

Sometime during the summer of 2009, Michael Floy Brannan began leasing the Property from J. N. to operate his business. On or before Monday, September 21, 2009, following heavy rains,[2] the sewer line connecting J. N.'s property to the street backed up, allowing sewer water to enter the Building through the toilet (the "2009 incident"). Brannan discovered the problem and observed that the sewer water, which smelled like raw sewage, covered the floor of the entire office area, rising to a level

_____

[2] According to the Dallas city manager, the September 2009 rains "caused a lot of flooding around town, not sewer flooding but storm water flooding."

of approximately one and one-half to two inches. It also seeped under the doors to extend ten to twelve feet or more into the warehouse area.

Brannan notified J. N., and J. N. notified the City, which sent its sewer foreman, Lee James, and another man out that day to inspect the problem. But per City policy, they did not enter the Building. James stated that they checked the manholes near the Building, however, and observed that the sewer water was flowing at a high level, but within the normal range. The water was in the trough below the manhole, and he observed no toilet paper or fecal matter. Nevertheless, because water had backed up into the Building, he recommended installation of a backflow prevention device on the sewer line leading to the Building.

The City retained ServPro of Douglasville/Carrollton ("ServPro"), which came out the next day to clean the Building. ServPro removed the carpet and set up fans and dehumidifiers for approximately three days to dry out the office. The ServPro workers also sprayed a chemical to try to remove the odor.

Later, at Brannan's request, Tina Clark, the City's acting public works manager, visited the Property, and Brannan accompanied her as she inspected the premises. During that inspection, Brannan observed that a manhole at the back of

3

building had water gushing out of it, with toilet paper and fecal matter all over the ground.

Despite ServPro's treatment, the odor lingered until J. N. had the affected sheetrock removed and replaced several months later. J. N. reduced Brannan's rent during the period in which he did not have full use of the office due to the lingering odor. In addition to replacing a portion of the sheetrock, J. N. installed new tile flooring, replaced the bathroom vanity and a bookshelf, and repainted the walls, all for a total cost of just under $5,000.

At some point after the 2009 incident, the City hired a plumbing company to install a backflow preventer to stop the water from backing up into the Building on future occasions. The Property has experienced no further problems with sewage overflow since the installation of the device. According to Kendall Smith, the City's former public works manager,[3] the City had previously attempted to install a backflow preventer after an earlier sewer backup on the Property. Smith could not

[3] Smith held the position of the City's public works manager from the late 1980's until late 2009 when he was promoted to city manager and Clark took over as public works manager.

remember the date of the earlier incident,[4] only that it occurred before the 2009 incident when he was still the public works manager (the "first incident"). On that occasion, the sewage flowed into buildings located at both 2025 and 2029 Marshall Huff Road. The City paid to clean the properties, and it hired a company to install backflow preventers on the lines going into each location. Smith believed that the backflow devices had been installed on both lines, but after the 2009 incident, the City discovered that a backflow preventer had not been installed on the line leading to the Building at 2025 Marshall Huff Road, so the City installed one at that time. Additionally, after the first incident, the City inspected the lines with a camera and found nothing other than a small stick blocking the line. The lines were again "camera'd" at some point after the 2009 incident, and no blockage or other problems were detected.

At a meeting of the City Council in November 2009, Clark presented J. N.'s request for reimbursement of $2,709.66, its cost for replacing the office carpet with tile, but the council took no action on the request, which had the effect of denying the request.

---

[4] The City posits on appeal, however, that this first incident occurred sometime prior to the summer of 2007.

J. N. subsequently filed this lawsuit, and the City filed two motions for summary judgment on J. N.'s claims. In the first motion, the City asserted that a municipality has no liability for the negligent maintenance of its sewer-drainage system, although it may be liable for the maintenance of a nuisance. The City asserted, however, that J. N. had failed to establish the existence of a nuisance in this case because David Butler testified in his deposition that the 2009 incident was the only sewer overflow that had occurred at the Property since J. N. acquired it. In the second motion, the City sought partial summary judgment on J. N.'s claim to recover the cost of mold remediation on the ground that J. N. failed to establish that the 2009 incident caused any mold or bacteria problem in the Building. Following a hearing on the motions, the trial court granted the City summary judgment on all of J. N.'s claims, without stating the basis for its ruling.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A trial court's grant of summary judgment is reviewed de novo on appeal, construing the evidence in the light most favorable to the nonmovant. Once the party moving for summary judgment has made a prima facie showing that it is entitled to judgment as a matter of law, the nonmovant must then come forward with rebuttal evidence sufficient to show the existence of a genuine issue of material fact.

6

(Citation omitted.) *Lore v. Suwanee Creek Homeowners Assn.*, 305 Ga. App. 165 (699 SE2d 332) (2010).

1. J. N. asserts that the trial court erred in dismissing its claim for a violation of the City's ministerial duties because the City did not specifically argue the issue before the trial court in its motion for summary judgment.[5] To the contrary, however, the City properly addressed the issue in both its brief and at the hearing as part of its argument regarding J. N.'s nuisance claim when it asserted that it had no negligence liability for maintaining the sewer line.[6]

"Traditionally, municipalities have been subject to suit for negligent performance or nonperformance of their ministerial functions while enjoying immunity from suit for the negligent performance or nonperformance of their governmental or discretionary functions. See OCGA §§ 36-33-1; 36-33-2; *Tamas v.*

---

[5] We note that J. N.'s appellate brief fails to comply with Court of Appeals Rule 25 (c) (1), and we take this opportunity to remind counsel of this provision, which requires that the sequence of arguments in the brief follow the enumeration of errors and be numbered accordingly. Nevertheless, it appears that J. N. provided argument and citation in support of each enumeration, albeit not in the required order, and we will address them.

[6] In any event, this claim was subject to dismissal without regard to any evidence submitted on summary judgment, and "a trial court has inherent authority to dismiss sua sponte a complaint in an appropriate case." (Citation and punctuation omitted.) *Paden v. Rudd*, 294 Ga. App. 603, 606 (3) (669 SE2d 548) (2008).

7

*Columbus*, 244 Ga. 200, 202 (259 SE2d 457) (1979)." *Early County v. Fincher*, 184 Ga. App. 47, 49 (360 SE2d 602) (1987). And it is well-settled that "the duty of a city to maintain its sewerage and drainage system in a good working and sanitary condition is a governmental function," for which no liability against the municipality exists in an action for negligence. (Citation omitted.) *Foster v. Mayor &c. of Savannah*, 77 Ga. App. 346, 349 (48 SE2d 686) (1948). See also *City of Rome v. Turk*, 235 Ga. 223, 224 (1) (219 SE2d 97) (1975).

Although J. N. frames his claim for violation of a ministerial duty as a breach of a duty to maintain the easement through which the sewer line ran, we have located no authority indicating that the language of an easement somehow alters the nature of the City's governmental function in maintaining its sewer lines. To the contrary, a municipality may not alter the extent of its liability by contract,[7] because "only the legislature has the authority to enact a law that specifically waives a municipality's sovereign immunity." (Citations omitted.) *CSX Transp., Inc. v. City of Garden City*, 277 Ga. 248, 249 (1) (588 SE2d 688) (2003) (city cannot alter its liability by entering into a contract to indemnify a third party in connection with the installation of sewer

---

[7] An easement is a contract, as to which the normal rules of contract construction apply. *Nat. Hills Exchange, LLC v. Thompson*, 319 Ga. App. 777, 778 (736 SE2d 480) (2013).

8

and water lines on the property). "Thus, pretermitting whether [J. N.] might have a viable negligence claim against a private defendant [for a breach of duty in connection with the easement, its] negligence action could not survive against the City based on sovereign immunity." *Goode v. City of Atlanta*, 274 Ga. App. 233, 235 (1) (617 SE2d 210) (2005) (no action for negligence existed against city for damages incurred when water main ruptured, causing water and mud to flood plaintiff's basement).

Accordingly, J. N. can state no claim for the violation of a ministerial duty against the City in connection with its maintenance of the sewer system, and the trial court properly granted the City's motion for summary judgment as to that claim.

2. But "[w]hile a municipality enjoys sovereign immunity from liability for negligent acts done in the exercise of a governmental function, it may be liable for damages it causes to a third party from the creation or maintenance of a nuisance." (Citation omitted.) *Hibbs v. City of Riverdale*, 267 Ga. 337, 337-338 (478 SE2d 121) (1996). See also *Mayor & c. of Savannah v. Palmerio*, 242 Ga. 419, 426 (3) (g) (249 SE2d 224) (1978) (a municipality "may be held liable for damages it causes to a third party from the operation or maintenance of a nuisance, irrespective of whether it is exercising a governmental or municipal function") (citation omitted). The Georgia

9

Supreme Court has described a nuisance as "performing a continuous or regularly repetitious act, or creating a continuous or regularly repetitious condition, which causes the hurt, inconvenience or injury" at issue. (Citations omitted.) *Palmerio*, 242 Ga. at 426 (3) (i).

"The difficulty arises in determining what conduct or act on the part of a municipality will result in the creation or maintenance of a nuisance, as opposed to an action in negligence." *Hibbs*, 267 Ga. at 338. To aid in determining whether a nuisance has been created, the Georgia Supreme Court

> [i]n *City of Bowman v. Gunnells*, 243 Ga. 809, 811 (2) (256 SE2d 782) (1979), . . . established guidelines for determining whether a municipality will be liable for creating or maintaining a nuisance: the defect or degree of misfeasance must exceed mere negligence (as distinguished from a single act); the act complained of must be of some duration and the maintenance of the act or defect must be continuous or regularly repetitious; and there must be a failure of municipal action within a reasonable time after knowledge of the defect or dangerous condition.

(Footnote omitted.) Id. Notably, "[t]he latter factor requires either knowledge or notice of the dangerous condition." (Citation omitted.) *Earnheart v. Scott*, 213 Ga. App. 188, 189 (1) (444 SE2d 128) (1994). See also *Kicklighter v. Savannah Transit*

10

*Auth.*, 167 Ga. App. 528, 531 (3) (307 SE2d 47) (1983). Applying these factors, the Supreme Court has found that "where a municipality negligently constructs or undertakes to maintain a sewer or drainage system which causes the *repeated* flooding of property, a continuing, abatable nuisance is established, for which the municipality is liable." (Citations omitted; emphasis in original.) *Hibbs*, 267 Ga. at 338.

J. N. asserts that the trial court erred in granting the City summary judgment on its nuisance claim because evidence existed that the Property had been subjected to repeated flooding and that the City had notice of the problem, creating a jury issue as to whether the City had created a nuisance. We agree.

The City moved for summary judgment on the basis of David Butler's testimony that only one sewer backup occurred while J. N. owned the property, arguing that a single occurrence is not sufficient to establish the creation of a nuisance. See *City of East Point v. Terhune*, 144 Ga. App. 865, 866 (242 SE2d 728) (1978). Although David Butler may have been aware of only one time in which the sewer overflowed, J. N. presented two rebuttal affidavits identifying other instances of flooding on the Property and the surrounding area.

11

Fletcher Lewis, who rented the Property prior to Brannan, averred that he leased the Property from mid-1992 to March 2009. He stated that he was

> aware from personal experience of recurring problems with the City's sewer system serving [the Property]. Specifically, during the time [he] was leasing [the Property], there were sewer backups into [the Property], both during the time [he] leased from [the Butler siblings' father], and later during the time [he] leased from [J. N.]. Although Lewis could not recall the exact number of sewer backups that had occurred, he believed that two had occurred when J. N. owned the Property, and one occurred when it was owned by the Butler siblings' father. He also recalled that the property next door at 2029 Marshall Huff Road had experienced multiple sewer backups. Although Lewis stated that he told a representative of the City about these recurring problems during an investigation of the 2009 incident, he did not indicate that he ever informed the City about these problems before that incident.

Additionally, Michael Butler, the Butler siblings' brother, averred that his company, Butler Investment Group, Inc., had owned the property at 2029 Marshall Huff Road since 1995. He also stated that he was aware of recurring backup problems at the two properties, including approximately seven to eight sewer backups at 2029 Marshall Huff Road, "two of which caused extensive damage." Michael Butler identified documentation reflecting that the property at 2029 Marshall Huff Road flooded on July 30, 2006, August 6, 2006, and October 19, 2007. He asserted that

these incidents were reported to the City, and the record contains a November 16, 2007 letter from Michael Butler to the City Manager submitting a claim for damages resulting from a "sewage spill" at 2029 Marshall Huff Road on October 19, 2007. He also stated that he was aware of at least one backup from the manhole between the two properties in 2003 because he had photographs taken at the time showing the manhole overflowing.

Pretermitting whether any or all of these prior incidents were reported to the City, Kendall Smith acknowledged that when he was public works manager, the City had become aware of at least one prior instance of flooding at both 2025 and 2029 Marshall Huff Road. Although the City determined at that time that backflow preventers were needed on the lines serving each of these properties to prevent future incidents, this corrective action was not taken with regard to the Property at 2025 Marshall Huff Road until after the 2009 incident.

Under these circumstances, we find that a jury issue exists as to whether the City was maintaining a nuisance. The condition involved here, maintaining a sewer line without a backflow preventer, was continuous at least from the time of the first incident until the device was installed after the 2009 incident. "Since there was some evidence in the record to support a finding that [the City] knew or should have known

13

after the first overflow that [a backflow preventer was needed], there is a question of fact whether the [City] was responsible for the second overflow and, thereby, for maintaining a nuisance." *DeKalb County v. Orwig*, 261 Ga. 137, 139 (2) (402 SE2d 513) (1991) (finding two occurrences of flooding sufficient to raise a jury issue on existence of nuisance where county was aware of first occurrence, but did not correct problem until after second occurrence). Accordingly, we reverse the trial court's grant of summary judgment to the City on J. N.'s nuisance claim.

3. J. N.'s appellate brief also contains an enumeration of error asserting that the trial court's summary judgment order "violates and misapplies the principles of OCGA § 24-9-67.1 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993)." In the body of the brief, J. N. argued that the trial court erred in disregarding the testimony and opinions of its experts, noting that any arguments regarding the merits of the expert testimony go to its weight, not to its admissibility. Although J. N.'s brief contains a bare assertion that J. N. presented sufficient evidence from experts to show that its property was damaged from the sewer backup and required further repairs and mediation, J. N.'s argument and citations address only the admissibility of the expert evidence.

14

But the City never contested the admissibility of the testimony of J. N.'s experts under OCGA § 24-9-67.1, *Daubert* or otherwise. Rather, the City argued that the expert testimony failed to connect J. N.'s claim for damages for mold remediation to the alleged nuisance and thus that J. N. failed to establish the element of causation with regard to that damage claim. Because the issue of admissibility was never raised, the trial court's summary judgment order cannot be construed as a ruling on the admissibility of such evidence. Accordingly, there is nothing for this Court to review in that regard. See generally *Hart v. Groves*, 311 Ga. App. 587, 588 (1) (716 SE2d 631) (2011) ("This is a Court for correction of errors below, and, in the absence of a ruling by the trial court, this Court has nothing to review.") (citation and punctuation omitted).

In its reply brief, however, J. N. reiterates that the record contains sufficient evidence, including expert testimony, that its property was damaged from the sewer backup and that the City did not adequately clean the property afterwards. Moreover, the factual recitation in J. N.'s initial appellate brief outlines its expert testimony and asserts that the City "mischaracterized and took great liberty with the testimony and opinions of [J. N.'s] experts relating to their view regarding the need for further cleaning and remediation of [the Building]." Accordingly, we will address the issue

15

of whether the trial court properly granted the City's motion for partial summary judgment as to J. N.'s claim to recover damages for remediation.

In December 2009, approximately three months after the 2009 incident, J. N. hired Michael Beuerlein to conduct a mold assessment of the property. Beuerlein visited the Building on or about December 29, 2009, and inspected only the office area. He then prepared a "Mold Assessment and Remediation Protocol" for the Property based on his findings. Beuerlein indicated that any mold resulting from the September 2009 incident should have been present at the time of his inspection three months later. During the inspection, Beuerlein found a few square inches of "light mold growth" on the drywall near the floor in the back office next to the door leading into the warehouse. Overall, however, the mold levels were low, and Beuerlein detected no odors. Beuerlein took a tape sample of the mold and sent it to a lab, which identified the sample as Chaetomium, a mold typically found only in areas with water damage. Beuerlein acknowledged, however, that he had no way of determining that the mold he located was, in fact, related to the 2009 incident. He could only say that it was related to water.

Beuerlein testified that the lab's confirmation that the substance he discovered was, indeed, mold led to his determination that mold remediation was necessary.

16

Beuerlein testified that any mold growing inside a building can be a problem. To address the mold situation, Beuerlein recommended the removal of a foot of drywall in all directions past the visible mold growth. Therefore, the only piece of drywall that needed to be removed "from a mold perspective" was a small section around the visible spot of mold.

Beuerlein also testified that drywall removal is typically recommended following any sanitary sewer flooding, and any porous items that came into contact with the sewage spill generally should be discarded. When any sanitary sewage or water potentially containing sewage hits drywall, the standard recommendation is to remove two feet from around the affected area because it may potentially be contaminated with bacteria. He explained that a difference exists between mold contamination versus sewage contamination, which generally reflects bacterial contamination. Beuerlein did not test for any bacterial contamination because it was not within the scope of his assignment from J. N.

Nevertheless, the remediation protocol he designed for the Building relied more on the fact that sewage water had been reported in the area than it had to do

17

with the discovery of mold.[8] Without the presence of sewage water, his recommendation for remediation would have been limited to removing the section of drywall immediately surrounding the area where mold was detected.

J. N. also hired David W. Bennett of Crown Construction and Consulting, LLC, to provide an expert evaluation of ServPro's work in cleaning the Building, and he opined that ServPro "failed to properly remediate the damage resulting from the Category 3 sewage backup incident that affected [the Property]. Although Bennett criticized ServPro's methodology, he failed to identify any mold, bacteria or other contamination in the Building resulting from ServPro's allegedly inadequate treatment.

As previously noted, our Supreme Court has determined that the nuisance alleged in this case would be considered a continuing, abatable nuisance. *Hibbs*, 267 Ga. at 338. And if a nuisance is abatable, "and therefore not necessarily permanent in nature, the measure of damages is the loss in fair market rental value plus actual

_____

[8] J. N. additionally hired David K. Nieman, who owns a remediation restoration company, to estimate the cost of performing Beuerlein's recommended mold remediation protocol. Although Nieman is certified to remove mold, he is not certified to detect or test for mold and he makes no independent assessments whether remediation is required. In preparing his estimate, he relied solely on Beuerlein's recommended protocol and provided no evidence of any additional contamination in the building.

damages." (Citation omitted.) *Baumann v. Snider*, 243 Ga. App. 526, 527-528 (1) (532 SE2d 468) (2000). And where

> the nuisance is not of a permanent and continuing character, but one which can and should be abated, the party injured has no right to assume that it will be maintained indefinitely; and his remedy is, not to recover in one action for all past and future damages, but to bring from time to time separate suits for the recurring injuries sustained, instituting each within the period prescribed by the statute of limitations for taking steps to recover damages actually suffered up to the time the action is filed.

(Citation and punctuation omitted.) *Burleyson v. Western & Atlantic R. Co.*, 91 Ga. App. 745, 752 (1) (87 SE2d 166) (1955). See also *Langley v. City Council of Augusta*, 118 Ga. 590, 598 (45 SE 486) (1903). Therefore, in the context of a continuing, abatable nuisance, evidence showing a possibility of future damage is insufficient to support recovery.

During his inspection three months after the 2009 incident, Beuerlein discovered a small patch of mold on the office wall. Although Beuerlein could not state definitively that the mold resulted from the 2009 incident, it did result from the drywall's exposure to water. We find this evidence sufficient to create a jury issue as to whether the mold resulted from the drywall's exposure to the sewer water during the 2009 incident. Beuerlein testified that this mold issue could be remediated by the

19

removal of a relatively small section of drywall, and the cost of that limited remediation may be recoverable if the jury determines that the City had created a nuisance and that the mold was caused by or resulted from that nuisance.

But J. N.'s evidence fails to establish that the 2009 incident led to any bacterial contamination, much less a contamination sufficient to require the extensive remediation outlined in Beuerlein's report. Although such remediation may be recommended for any exposure to sewer water, the record does not support the recovery of this expense as actual damages resulting from the alleged nuisance. The record is devoid of any further mold issues or of any actual bacterial contamination in the Building since Beuerlein did not test for bacterial contamination. And the mere possibility or potential for bacterial contamination is insufficient to state a claim to damages for a continuing, abatable nuisance. "If the damage incurred by the plaintiff is only the imaginary or possible result of a tortious act . . . , such damage is too remote to be the basis of recovery against the wrongdoer." OCGA § 51-12-8. See also *Jaraysi v. Sebastian*, 318 Ga. App. 469, 477 (2) (733 SE2d 785) (2012) (damages cannot be established by mere speculation, conjecture and guesswork) (citation omitted). Cf. *Hammond v. City of Warner Robins*, 224 Ga. App. 684, 690 (482 SE2d

422) (1997) (stigma to realty, in and of itself, is too remote and speculative to be a basis for damages in a nuisance claim).

Accordingly, we affirm the trial court's grant of partial summary judgment as it relates to any claim by J. N. to recover for the cost of remediation of a potential contamination,[9] but we reverse to the extent that the trial court granted summary judgment on any claim by J. N. to recover for the remediation of any actual contamination found in the Building.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Dillard, J., concur.*

---

[9] Thus, although Beuerlein testified that the presence of mold on the outside of a wall raises the potential that additional mold exists behind the wall, he indicated that "it [was] not likely that significant amounts of mold are present." And the mere potential for further mold is insufficient to establish actual damages. J. N. has not pointed us to evidence that any additional mold actually was discovered when the company eventually replaced the drywall in the Building.