**SECOND DIVISION**
**BARNES, P. J.,**
**DOYLE, P. J., DILLARD, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/**

**October 30, 2012**

# In the Court of Appeals of Georgia

A12A0917. JARAYSI et al. v. SEBASTIAN et al.

DOYLE, Presiding Judge.

This appeal concerns a dispute between a landlord and a former tenant. Lee Jaraysi, Nazareth Management, LLC, and Nazareth Plaza, LLC, the owner and operators of Nazareth Plaza shopping center in Marietta (collectively, "Jaraysi" or "Nazareth"), sued lessee Alberto Sebastian and lease guarantor, Sebastian Auto Sales, Inc., (collectively, "Sebastian"), for breach of contract and damage to real property. Following a bench trial, the court found in favor of Sebastian on these claims and in favor of Jaraysi on Sebastian's counterclaim. On appeal, Jaraysi contends the trial court erred by refusing to enforce the lease or to award monetary damages on his claim for property damage to the leased premises. For the reasons that follow, we

affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

Jaraysi owns the Nazareth Plaza shopping center in Marietta. In October 2005, Nazareth leased space in the shopping center to Sebastian for use as a night club. Jaraysi also owns an unfinished office building located across the street from the shopping center, and Sebastian understood that Jaraysi would be completing construction by May 2006. Jaraysi did not complete construction of the office building by May 2006; nonetheless, Sebastian and Nazareth signed an amendment to the lease in October 2006. As amended, the term of the lease ran from October 1, 2006, through September 30, 2010, and the monthly rent increased to $8,800 for the first year with scheduled increases of three percent each year thereafter. In addition to some other special stipulations, the amended lease provided that "[s]pace will be leased out in 'AS IS' condition. Under this agreement, [n]o work, whatsoever, is required to be done b[y] the Landlord." Otherwise, the parties understood and agreed "[e]xcept as amended by this Lease Amendment, all of the terms, conditions[,] and provisions of the Lease shall remain in full force and effect."

With respect to maintenance and repair of the premises, the parties agreed that nothing contained in the lease "shall be deemed or construed to impose upon

2

Landlord any obligation or liability whatsoever for care, supervision, repair, improvement, addition, change, or alteration of the Premises, the building of which it is a part or the Shopping Center, other than as in this Lease expressly provided."[1] The Lease Agreement contained a waiver provision that provided "[o]ne or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition," and an Entire Agreement clause that stated: "This Lease contains the entire agreement between the parties and no agreement, representation or inducement shall be effective to change, modify or terminate this Lease in whole or in part unless in writing and signed by the parties." Under Exhibit "H," Special Stipulations, Sebastian agreed to accept the premises in an "as-is condition." The Lease Agreement also included an express covenant of quiet enjoyment:

> Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants and agreements herein required to be performed on the part of the Tenant, Tenant shall, subject to the terms of this Lease, at all times during the continuance of this Lease have the peaceable and quiet enjoyment and possession of the Premises against Landlord and all persons or entities claiming by, through or under Landlord. Anything

[1]Neither the Lease Agreement nor the subsequent amendment thereto required the Landlord to maintain the Shopping center or provide lighting or security.

3

herein to the contrary notwithstanding, Landlord expressly reserves the right at any time(s) to change the name and/or address of the Shopping Center and to make changes, additions, deletions, removals, replacements, alterations and improvements in and to all or any part of the Shopping Center. In no event shall Landlord be subject to any liability therefor nor shall any such actions constitute a full or partial actual or constructive eviction or a default of Landlord's covenant of quiet enjoyment or entitle Tenant to any compensation, rent reduction, Lease amendment or termination or any other redress or remedy, and the same shall apply to any action taken by Landlord with respect to the Common Areas pursuant to Article V hereof.

After Sebastian opened the night club in 2006 there occurred, according to Sebastian, a "ramp up of crime" around neighboring clubs. Sebastian's customers complained about criminal activity in the parking lot, including fights, vehicle break-ins, and the use of illegal drugs. His customers also complained that people were hiding in an unfinished building owned by Jarasyi and located across the street from the shopping center. Sebastian notified Jaraysi about the criminal activity and what he contended to be poor lighting in the parking lot. Jaraysi indicated he would "go ahead and take care of it." Jaraysi also told Sebastian that he would finish the office building. According to Sebastian, Jaraysi was continuously promising "to finish the building, put in more lighting.., [fix] the street signs[,] and [get] more security in

4

there," although Jaraysi did not do any of these things between April 2009 and May 2010.

In April 2009, Sebastian's attorney notified Jaraysi that Sebastian was "forced to declare the lease" void due to his failure to provide quiet enjoyment of the leased premises and that Sebastian and his night club would vacate the premises effective July 30, 2009. After Jaraysi received the letter, Sebastian told Jaraysi that he was not making enough money because he had lost clientele. Jaraysi told Sebastian that he was "willing to reduce the rent in order to keep Sebastian going."

Sebastian further testified that he and Jaraysi agreed that Sebastian would pay reduced rent in the amount of $6,500 "until the business picked up again." Jaraysi testified that he agreed to reduce the rent for the months of June, July and August 2009 and he produced an "Amendment to amendment to lease dated 10-03-06," signed on behalf of Nazareth by Jaraysi, indicating that Nazareth agreed to reduce the rent to "give [Sebastian] the opportunity to build the business back up." Sebastian paid $6,500 per month rent from June 2009 through April 2010. When Sebastian sent one of his managers to submit the rent check for May 2010, Jaraysi returned the check, saying that he would no longer accept $6,500, but that he would instead accept $9,300. Sebastian did not pay rent for May 2010 or thereafter, and vacated the

5

premises in April 2010. Jaraysi instituted dispossessory proceedings in May 2010 and obtained a writ of possession on June 8, 2010.

In June 2010, Jaraysi filed the underlying lawsuit against Sebastian seeking to recover the difference between the $9,335 monthly rental amount contemplated by the lease and the $6,500 paid by Sebastian from September 2009 through April 2010, the full amount of unpaid rent for May 2010 through September 2010, damage to real property, and attorney fees. Sebastian answered, asserting the defenses of payment, waiver, and estoppel, and he counterclaimed for breach of the covenant of quiet enjoyment, seeking lost profits and attorney fees. After a bench trial, the trial court entered a written order in favor of Sebastian on the claims asserted by Jaraysi and in favor of Jaraysi on Sebastian's counterclaims. Jaraysi's appeal followed.

1. While Jaraysi enumerates five errors on appeal, the first four arise out of his argument that the trial court erred by finding that he breached the parties' contract. We agree that the Lease Agreement was a valid and binding contract[2] and that Jaraysi

---

[2] Despite this enumeration of error, there does not appear to be any dispute that the Lease Agreement and Amendment were valid and binding contracts. Sebastian does not argue to the contrary or that Jaraysi breached any of its *express* terms. Jaraysi does argue that there was a mutual departure by the parties from the express contract terms, and that argument is addressed further below.

did not breach the Lease Agreement or its written amendment, including the express covenant of quiet enjoyment.

(a) *Breach of Lease Agreement.*

Sebastian's only breach of contract allegation is that Jaraysi breached an implied covenant of quiet enjoyment. Specifically, Sebastian argues that Jaraysi failed in this regard as a result of criminal activity in the parking area of the shopping center, the need for more lighting to deter crime, and the unfinished office building. As an initial matter, we note that nothing in the Lease Agreement, including the terms of the express covenant of quiet enjoyment, obligated Jaraysi to provide security or additional lighting or to complete construction of the office building. To imply such obligations would be inconsistent with the terms of the Lease Agreement, which indicated that the premises were leased "as-is" and that Jaraysi had no "obligation or liability whatsoever for care, supervision, repair, improvement, addition, change, or alteration of the Premises, the building of which it is a part or the Shopping Center." Thus, none of these failures constitute a breach of the Lease or express covenant of quiet enjoyment.

Sebastian's defense, however, depends on the covenant for quiet enjoyment of the premises, which is necessarily implied in every lease.[3] Such a covenant "goes to the extent of engaging that the landlord has a good title and can give a free and unencumbered lease of the premises for the term stipulated."[4] The covenant of quiet enjoyment is one of three separate covenants that arises out of a general warranty of title.[5] Thus, "[t]o constitute a breach of the covenant of quiet enjoyment, an eviction

---

[3] See *Myung Sung Presbyterian Church, Inc. v. North American Assoc. of Slavic Churches & Ministries, Inc.*, 2008 Ga. App. 808, 813 (3) (662 SE2d 745) (2008) "The introduction of an implied term into the contract of the parties can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties." Id. at 811 (2) (punctuation omitted). Thus, while a covenant for quiet enjoyment of the premises is necessarily implied in every lease, when, as here, the parties expressly provided for it, there is no need to imply the covenant. Nonetheless, the law applicable to an implied covenant of quiet enjoyment may be applicable to the extent it does not contradict the language used by the parties in the Lease Agreement or impose obligations not contemplated by the parties.

[4] (Punctuation omitted.) *Dwyer v. McCoy*, 236 Ga. App. 326, 329 (5) (512 SE2d 70) (1999) (where life tenant leased premises and then died before the lease term expired, covenant of quiet enjoyment was breached because the unexpired term of the lease was void and unable to be fulfilled). See also *Adair v. Allen*, 18 Ga. App. 636 (2) (89 SE 1099) (1916).

[5] See *McMurray v. Housworth*, 282 Ga. App. 280, 285 (2) (638 SE2d 421) (2006). The other two covenants are (1) the covenant of a right to sell; and (2) the covenant of freedom from encumbrances. See id.

or equivalent disturbance by title paramount must occur."[6] The disturbance must be "of such grave and permanent character as would render the premises unfit for tenancy, and is such as would actually deprive and would legally import the intent to deprive the tenant of their enjoyment, it amounts in law to an eviction of the tenant. . . ."[7] Further, the covenant of quiet enjoyment obligates the landlord to protect the tenant only against the landlord's own acts and not against the acts of strangers that disturb the tenant in his quiet enjoyment and possession of the rented premises.[8]

---

[6] Id. at 285-286 (2). In *Myung Sung*, the lessee was deprived of the use of a leased building when the City of Norcross removed it from the landlord's premises. See *Myung Sung*, 291 Ga. App. at 808-809. This Court noted that it was not necessary for the lessee to actually vacate the property to establish a breach of the implied covenant of quiet enjoyment, but could establish a breach by showing that the lessor "substantially interfered with the lessee's right to use and enjoyment of the premises." Id. at 813 (3). Nonetheless, to establish a constructive eviction, the lessee must show that the property "ha[s] become an unfit place for the [lessee] to carry on the business for which it was rented." See *Alston v. Ga. Credit Counsel, Inc.*, 140 Ga. App. 784, 785 (1) (232 SE2d 134) (1976). (to establish constructive eviction, premises must be rendered untenantable, not just uncomfortable).

[7] *Feinberg v. Sutker*, 35 Ga. App. 505, 506 (1) (134 SE 173) (1926) (demolition of building adjoining rented property rendered leased premises unsafe and unusable). See also *Alston*, 140 Ga. App. at 785 (1).

[8] See *Parker v. Munn Sign & Advertising Co.*, 29 Ga. App. 420 (115 SE 926) (1923) (no breach of quiet enjoyment where third party destroyed part of the buildings of the rented premises); *Eley v. L. & L. Mfg. Co.*, 30 Ga. App. 595 (118 SE 583) (1923) (disorderly tenants, not landlord, were liable to tenant who abandoned premises due to nightly noise).

There is no evidence in the record that any conduct of Jaraysi prevented Sebastian from using his premises for a nightclub. To the contrary, despite the increase in criminal activity, incomplete office building, and need for improved lighting, Sebastian remained on the premises and operated his nightclub until April, 2010, when Jaraysi refused to accept the reduced rent. This does not amount to an actual or constructive eviction or a substantial interference with his right to use and enjoy the leased premises, which were not rendered untenantable.[9]

Sebastian relies on *Hathaway v. Gorfine*[10] to support his argument that Jaraysi's failure to provide adequate lighting can support a breach of the covenant of quiet enjoyment. In *Hathaway*, the lessor and lessee entered into a written lease as to an area of land in a shopping center where the lessee was to construct the premises.[11] The lessor sued the lessee for rent due under the lease, and the lessee counterclaimed for breach of the covenant of quiet enjoyment. The evidence showed that at the time

---

[9] See *Hardwick, Cook & Co. v. 3379 Peachtree, Ltd.*, 184 Ga. App. 822, 825 (3) (363 SE2d 31) (1987) (Despite undisputed substantial disruption at the leased premises during renovation, lessee "continued its occupancy and its business during the renovation, and nothing in the record indicates a constructive eviction.")

[10] 134 Ga. App. 748, 749 (216 SE2d 338) (1975).

[11] See id. at 748.

the leased premises were ready for occupancy, the landlord had not completed the shopping center, there was no parking lot, landscaping was unfinished, and there existed a problem in maintenance and "keeping the shopping area lighted"; this Court concluded that the lessee, who was completely unable to use the leased premises for the purposes intended, had been constructively evicted.[12]

*Topvalco, Inc. v. Garner*,[13] relied upon by Sebastian, is also inapposite. Therein, the lessee argued that the landlord failed to provide adequate security contrary to a covenant of quiet enjoyment. The issues on appeal were whether the lessee had waived the covenant of quiet enjoyment by remaining on the premises, and if not, whether she could recover lost profits for such a breach.[14] *Topvalco* involved no discussion of the lease terms between the parties, nor does it stand for the proposition that implied covenants of quiet enjoyment include an obligation to provide adequate security.

(b) *Pre-lease Promise*.

---

[12] See id. at 749-750 (1).

[13] 210 Ga. App. 358 (436 SE2d 25) (1993).

[14] See id. at 261 (2).

11

Sebastian claims that Jaraysi made a pre-lease promise to complete the office building adjacent to the shopping center by May 2009. Irrespective of whether Jaraysi made such promise or not, the Lease Agreement contained a merger clause that the lease contained the entire agreement between the parties and "no agreement, representation or inducement shall be effective to change, modify or terminate this Lease in whole or in part unless in writing and signed by the parties." A promise made by the parties prior to the execution of the Lease Agreement or its Amendment cannot be used to vary the express terms of the contract.[15]

(c) *Oral Post-Lease Promises.*

Sebastian argues that Jaraysi breached a subsequent oral agreement to accept reduced rent in June 2009 and thereafter, and to provide security and additional lighting and to finish the adjacent office building. A lease, such as this, for a period

_____

[15] See *Taylor Freezer Sales Co. Inc. v. Hydrick*, 138 Ga. App. 738, 741 (4) (227 SE2d 494) (1976) ("Prior and contemporaneous statements and agreements cannot be shown to vary, contradict or change the terms of a valid written contract purporting on its face to contain all the terms of an agreement between parties.") Further, we note that Sebastian executed the Amendment in September 2006, knowing that Jaraysi had not completed construction of the office building by May 2006. Sebastian argues that Jaraysi should be bound by his promises under the doctrine of promissory estoppel, but because he signed the Amendment with full knowledge that Jaraysi's promise of completion by May 2006 had not occurred, he cannot establish that he was induced to sign the lease in reliance on the promise. See OCGA § 13-3-44 (a).

longer than one year must be in writing because it falls within the Statute of Frauds, and "a contract which is required by the Statute of Frauds to be in writing can not be modified by a subsequent agreement in parol."[16] As such, the parties could not enter into an oral agreement to modify the four-year lease.

However, even though the attempt at oral modification of the Lease Agreement may not satisfy the Statute of Frauds, where "a modification of the written contract has been agreed to by all parties, performed by one and accepted by the other, there [can be] a waiver of the provisions of the original contract."[17]

Here, the parties expressly agreed to reduce the rent for a period of time ranging from "the three months of June, July and August, 2009" to "until the business picked up again" to help Sebastian build his business back up. And there is evidence to support the trial court's finding that even if Jaraysi only agreed to three months,

---

[16] OCGA §13-5-30 (5); *B-Lee's Sales Company, Inc. v. Shelton*, 141 Ga. App. 870, 870-871 (234 SE2d 702) (1977). Further, the Lease contained an "Entire Agreement" clause that prohibited oral modifications. *Digby's, Inc. v. Emory University*, 227 Ga. App 176, 177-178 (489 SE2d 81) (1997).

[17] *Lester v. Trust Company of Ga.*, 144 Ga. App. 526, 527 (241 SE2d 633) (1978) (Where court determined that Statute of Frauds or a lack of consideration did not bar contract claim because the Bank's acceptance of payments amounted to a waiver of the terms of the original contract during the period of the quasi-new agreement.); *B-Lee's Sales*, 141 Ga. App. at 872-873.

Jaraysi waived his right to insist on the original Lease payment terms for the period of time between September 2009 and May 2010 when Sebastian tendered and he accepted reduced rent payments and before he gave notice of his intent to reinstate the rent payment terms of the original lease.

> Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.[18]

Thus, the trial court did not err by rejecting Jaraysi's claim for the difference in unpaid rent from September 2009 to May 2010.

There is no evidence, however, that Jaraysi waived the "as-is" or the "maintenance and repair" clauses or engaged in a course of conduct or business practice whereby he obligated himself to provide security and additional lighting and to complete the office building. As testified to by Sebastian, Jaraysi did none of these

---

[18] OCGA §13-4-4. Any departure relates only to the specific term altered by the departure and not the remaining terms of the contract. *Wright Carriage Co. v. Business Dev. Corp. of Ga., Inc.,* 221 Ga. App. 49, 52 (1) (471 SE2d 218) (1996); *State Farm Mut. Ins. Co. v. Strickland*, 218 Ga. 94 (1) (126 SE2d 683) (1962).

things between April 2009 and May 2010. At best, Jaraysi's course of conduct was consistent with the terms of the Lease Agreement and would have been to disavow any additional obligations. As such, the trial court erred by finding that Jaraysi had breached a subsequent oral agreement to provide security and additional lighting and to complete the office building, and in denying Jaraysi unpaid rent from May 2010 through the end of the Lease term on this basis.[19]

2. Jaraysi further contends that the trial court erred in failing to award him monetary damages on his claim for damage to real property.[20] Jaraysi testified that he inspected the property after Sebastian vacated the leased premises and found "a lot of damages to the floor, . . . the sinks, all equipment," as well as leftover trash and debris. According to Jaraysi, he personally made some repairs to the premises, and he "fixed the ceiling, broken walls" and "some of the floors," and "spen[t] about

---

[19] On remand, it is for the trial court to determine whether Jaraysi's rejection of the May 2010 rent payment was sufficient notice of his intent to rely on the original Lease payment terms and the impact on any rent that may be due under the lease, if any.

[20] We also note that, inconsistent with his enumeration of error, Jaraysi makes an alternate argument that the trial court did not "provide a ruling" on his damage-to-real-property claim. But the trial court, after hearing evidence related to the claim for property damage to the leased premises, entered a judgment on "plaintiffs' claims."

15

maybe close to eighty five, eighty six hundred dollars." The nature of the expenditures was not documented or prorated as to the particular repair.

In response, Sebastian examined the photographs Jaraysi took after Sebastian vacated the premises, which were introduced into evidence to support Jaraysi's claims. Sebastian maintained that they showed "just trash," and that there was "[n]o structural damage at all." According to Sebastian, the ceiling tiles appeared to be "just push[ed] away from the base," and "were not like that when we left." On cross examination, Sebastian denied destroying the carpets or taking any sinks or countertops, but he did not deny that he scratched the floors.

In assessing the evidence, the trial court was entitled to find Sebastian more credible than Jaraysi.[21] The trial court could have concluded that Sebastian had not damaged the ceiling or broken the walls, which Jaraysi said he spent money to fix. Although the evidence may have demanded the conclusion that Sebastian damaged the floors by scratching them, Jaraysi did not show what he expended in repairing the scratches to the floor. Thus, while the cost to repair real property may be an

---

[21] *See Hayes v. Alexander*, 264 Ga. App. 815, 817 (592 SE2d 465) (2003) ("In a bench trial, the trial court determines the credibility of witnesses and may accept or reject any part of a witness's testimony, even in the absence of contradictory testimony.") (citation omitted).

appropriate measure of damages, as Jaraysi asserts,[22] the trial court was not required to conclude that the evidence established the costs of repairing damage for which Sebastian was responsible. And damages cannot be established by "speculation, conjecture and guesswork."[23] Accordingly, there was at least some evidence from which the trial court could find for Sebastian on Jaraysi's claim for damages to real property.[24]

*Judgment affirmed in part, reversed in part and remanded. Barnes, P.J. and Dillard, J., concur.*

---

[22] *See Ga. Northeastern R.R. v. Lusk*, 277 Ga. 245, 247 (2) (587 SE2d 643) (2003).

[23] *Song v. Brown*, 255 Ga. App. 562, 564 (565 SE2d 884) (2002) (punctuation omitted).

[24] *See Page v. Braddy*, 255 Ga. App. 124, 126 (564 SE2d 538) (2002) ("While some portion of the claimed sum may have been properly recoverable[,] such portion is not determinable from the lump sum evidence presented." (punctuation omitted)).