**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 20, 2013**

# In the Court of Appeals of Georgia

A13A1121. CITRUS TOWER BOULEVARD IMAGING CENTER, LLC v. DAVID S. OWENS, MD, PC et al.

A13A1122. DAVID S. OWENS, MD, PC v. CITRUS TOWER BOULEVARD IMAGING CENTER, LLC.

DILLARD, Judge.

These appeals arise out of a lease by Citrus Tower Boulevard Imaging Center, LLC ("Citrus") to David S. Owens, MD, PC ("the PC") of certain magnetic resonance imaging equipment and related services. The trial court granted summary judgment to the PC's principal, Dr. David. S. Owens ("Owens") in Citrus's action on a guaranty agreement executed in connection with the lease. Citrus appeals from that order in Case No. A13A1121, arguing that the admissions in Owens's answer created a genuine issue of material fact, which precluded the grant of summary judgment. In Case No. A13A1122, the PC cross-appeals from the trial court's order granting

summary judgment to Citrus in its action to recover rent and other amounts owing under the lease. Specifically, the PC argues that the trial court erred because, *inter alia*, the lease was ambiguous and parol evidence showed that the conditions required for the commencement of the lease term never occurred. For the reasons noted *infra*, we affirm in both cases.

At the outset, we note that summary judgment is appropriate when the moving party can show that there is "no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."[1] A movant may meet this burden when "the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case."[2] And should the moving party meet this burden, "the nonmoving party cannot rest on its pleadings, but must point to specific evidence giving rise to a triable issue."[3]

---

[1] *Bd. of Comm'rs v. Barefoot*, 313 Ga. App. 406, 408 (721 SE2d 612) (2011) (punctuation omitted).

[2] *Id.* (punctuation omitted).

[3] *Id.* (punctuation omitted).

So viewed, the record shows that Owens, the PC's principal, is a radiologist whose practice focuses on reading and interpreting body-scan images made with CRT, MRI, X-Ray and other medical equipment. The PC, according to Owens, "receives and interprets film from primarily around the Southeast."

Citrus, a Georgia limited-liability company, owned and managed a diagnostic-imaging center in Clermont, Florida. On or about December 16, 2008, Citrus and the PC entered into the Lease Agreement (the "Lease") at issue here. And under the terms of this Lease, which the parties agreed would be governed by Georgia law, the PC leased from Citrus the use of certain imaging equipment and related services.[4] The PC initially agreed to pay Citrus rent in the amount of $100,000 per month, but that amount was later increased to $150,000 per month in a January 2009 amendment to the Lease. The term of the Lease was ten years, "commenc[ing] on the first day that the Imaging Center is functionally operational." The PC's right to use the leased

---

[4] Under the schedule of equipment use the PC was afforded "200 MRI scans/CPT Codes per month," and these scans could be scheduled on an as needed basis. By the January 2009 amendment to the Lease, the number of "leased MRI scans" per month was increased to 300.

The Lease also contemplated that the PC would have the right to use a medical office suite and the services of necessary personnel to operate the Imaging Center facility.

equipment was on a non-exclusive basis, and the rent was payable whether or not the PC actually used the leased equipment.[5]

On or about December 15, 2008, Owens executed a "Guarantee Agreement" (the "Guaranty"), also governed by Georgia law, pursuant to which the guarantor agreed to "guarantee[] to [Citrus] the full and prompt payment in cash and whenever due . . . all sums now or hereafter payable under the Lease . . . ." And while it is not disputed that Owens signed the Guaranty, the guarantor is designated as "David Owens, MD, PC" in two separate places, with Owens writing "David Owens – MD PC" on the signature line. Owens also signed his name under the signature line accompanied by what he contends to be—and Citrus does not dispute—the designation of "Managing Member."

In October 2010, the PC announced that it was opening a satellite office in Clermont, Florida. Owens testified that the Clermont facility began "scanning real patients . . . around October of 2010," and that the facility opened in the autumn of 2010. At this time, Owens and the PC began reading MRI scans taken at the Clermont facility.

---

[5] Pursuant to the Lease, the rent was payable "whether or not the Equipment is actually used by Lessee during all of the Scheduled Time."

4

Nevertheless, the PC failed to make any rent payments under the Lease, and in April 2011, Citrus sent a demand letter to Owens and the PC requesting payment of past due rent, plus interest, from December 2010 through April 2011. And when no payments were forthcoming, Citrus sued the PC and Owens in the State Court of Fulton County, alleging breach of contract under both the Lease and Guaranty. The trial court subsequently granted Owens's cross-motion for summary judgment on Citrus's claims under the Guaranty. Citrus appeals from this order in Case No. A13A1121. But the trial court granted Citrus's motion for summary judgment against the PC as to Citrus's claims on the Lease. In Case No. A13A1122, the PC cross-appeals from this order.

*Case No. A13A1121*

1. Citrus claims that the trial court erred in granting Owens's motion for summary judgment because Owens's admissions in his original answer created a genuine issue of material fact as to whether he signed the Guaranty in his personal capacity. We disagree.

Paragraph 11 of Citrus's complaint alleged, in pertinent part, that "[o]n or about December 15, 2008, Owens executed a Guaranty (the "Guaranty")." And in Paragraph 12 of its complaint, Citrus maintained that "[p]ursuant to the terms of the

5

Guaranty, Owens guaranteed payment of all sums owing under the Lease, including all costs, expenses, and attorneys' fees." Owens and the PC filed an answer in which "Defendant Owens" admitted the allegations of Paragraphs 11 and 12 of Citrus's complaint.[6] In an amended answer, Owens later denied the allegations of Paragraph 11 and Paragraph 12 of the complaint.

As applicable here, former OCGA § 24-3-30 provides that "[w]ithout offering the same in evidence, either party may avail himself of allegations or admissions made in the pleadings of the other."[7] For an admitting party to contravene its admission, "the party must first amend the pleading to withdraw the admission in judicio before such evidence may be submitted."[8] Even so, the other party may rely on the original admission as evidence.[9] In other words,

---

[6] The answer, which was submitted by Owens's attorney, set forth defined terms for both the PC ("Owens PC") and Owens individually ("Owens"), and the answer shows that it was Owens, in his individual capacity, who admitted the paragraphs of the complaint at issue.

[7] This provision is now codified at OCGA § 24-8-821, and it is virtually identical to the predecessor statute ("Without offering the same in evidence, either party may avail himself or herself of allegations or admissions made in the pleadings of the other.").

[8] *Wahnschaff v. Erdman*, 232 Ga. App. 77, 78 (1) (502 SE2d 246) (1998).

[9] *Id.* at 78-79 (1).

[a]lthough a party may withdraw or strike from the pleadings an admission in judicio by amendment and tender evidence to contravene such admission, the opposite party can tender in evidence the original admission in judicio against such party as an admission against interest. Even after its withdrawal, an opposing party undeniably has a right to use it as evidence.[10]

Notwithstanding the foregoing, an admission in judicio applies only to "the admission of fact and does not apply where the admission is merely the opinion or conclusion of the pleader as to law or fact."[11] Thus, where the admission is simply "an opinion on the part of the party making it as to the legal effect of a paper,"[12] the withdrawn admission is not a fact that can be taken advantage of by the opposing party.[13]

---

[10] *Georgia-Pacific, LLC v. Fields*, __ Ga. __ (1) (Case Nos. S12G1393, S12G1417; decided September 9, 2013) (punctuation omitted).

[11] *Howell Mill/Collier Assoc. v. Pennypacker's, Inc.*, 194 Ga. App. 169, 172 (2) (390 SE2d 257) (1990) (punctuation omitted); *accord Wahnschaff*, 232 Ga. App. at 79-80 (2). There may be an admission in judicio as to the existence of a fact or legal relationship between the parties. *See Howell Mill/Collier Assoc.*, 194 Ga. App. at 172 (2).

[12] *McElmurray v. Blodgett*, 120 Ga. 9, 16 (4) (47 SE 531) (1904); *accord Ferguson v. Carver*, 257 Ga. App. 849, 851 (2) (572 SE2d 700) (2002).

[13] *McElmurray*, 120 Ga. at 16 (4).

In the case *sub judice*, Owens withdrew his admissions by amending his answer,[14] and so the relevant issue is whether the withdrawn admissions were nevertheless evidence of a fact that precluded the trial court's grant of summary judgment to Owens. And in our view, the withdrawn admissions do not constitute such evidence. Owens's admission that he "executed" the Guaranty may demonstrate that he *signed* the Guaranty, but that fact is undisputed and in itself does not create a genuine issue of material fact as to whether Owens was *personally* bound thereby.[15] And Owens's admission that "[p]ursuant to the terms of the Guaranty, [he] guaranteed payment of all sums owing under the Lease" is only an opinion or conclusion as to the legal effect of that instrument. Although Citrus argues that this is evidence of the "fact" of Owens's guaranty of the Lease obligations, the admission was made in reference to the "terms of the Guaranty," which is the controlling legal instrument.

[14] *See Georgia Pacific*, __ Ga. at __ (1) (finding appellees "correct that withdrawal or amendment [to their original pleadings] prevents the original admissions from serving as solemn admissions in judicio"). *Compare Walker v. Sutton*, 222 Ga. App. 638, 639 (1) (476 SE2d 34) (1996) (finding that appellee was "estopped from tardily contradicting his responsive pleading, interrogatory responses and pretrial order because of [appellant's] detrimental reliance").

[15] *See generally Elwell v. Keefe*, 312 Ga. App. 393, 395 (718 SE2d 587) (2011) (noting that "[c]ontracts may be signed by one acting in a representative capacity, or a representative may make himself liable for the debt of the corporation" (punctuation omitted)).

8

And it is well established that construction of a contract is a question of law for the court "based on the intent of the parties *as set forth in the contract*."[16] To be sure, if this admission remained in the answer, Citrus may have been entitled to take advantage of such admission "as a consent . . . that the case might be determined upon that theory without reference to what was the correct interpretation of the [Guaranty]."[17] But the admission was in fact withdrawn, and barring exceptions such as ambiguity or prejudice, "it is immaterial what may have been said by one of the parties . . . as to what the [Guaranty] meant."[18]

As to whether Owens was obligated under the Guaranty, this Court examines the language of the contract to "determine in what capacity the representative is

---

[16] *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 73 (2) (538 SE2d 886) (2000) (emphasis supplied).

[17] *McElmurray*, 120 Ga. at 16.

[18] *Id.* We note that this principle also applies to Owens's affidavit to the extent he offered statements as to his intent in entering into the Guaranty. Indeed, because the Guaranty is unambiguous, "parol evidence is neither admissible nor probative." *Dennisson v. Lakeway Publishers, Inc.*, 196 Ga. App. 85, 86 (2) (395 SE2d 366) (1990). The trial court, after finding that Citrus accepted the Guaranty "wherein only [the] PC is bound," additionally considered Owens's averment that he had been unwilling to personally guaranty the PC's obligations under the Lease. But if the trial court's analysis was, in part, erroneous, we will nevertheless affirm the grant of summary judgment if it is right for any reason. *See, e. g., Travelers Excess & Surplus Lines Co. v. City of Atlanta*, 297 Ga. App. 326, 326 (677 SE2d 388) (2009).

9

bound."[19] Further, contracts of surety or guarantee are "strictly construed and are statutorily barred from extension by interpretation or implication."[20] As noted *supra*, the guarantor under the Guaranty is specifically designated as the PC. Not once, but twice. Indeed, the name of the PC is clearly written on the signature line along with Owens's signature, under which is Owens's signature again, and which is then followed by an indication that he is signing in a representative rather than a personal capacity.[21] The express and unambiguous language of the Guaranty establishes that the guarantor is the PC, not Owens.[22]

---

[19] *Grot v. Capital One Bank (USA), N. A.*, 317 Ga. App. 786, 794 (6) (732 SE2d 305) (2012) (punctuation omitted).

[20] *Elwell*, 312 Ga. App. at 395; *see also Caves v. Columbus Bank & Trust Co.,* 264 Ga. App. 107, 114 (589 SE2d 670) (2003) (noting that "Georgia courts strictly construe guaranty agreements in favor of the guarantor," and that "the guarantor's liability cannot be extended by implication or interpretation."); OCGA § 10-7-3 ("The contract of suretyship is one of strict law; and the surety's liability will not be extended by implication or interpretation.").

[21] *See Groth v. Ace Cash Express, Inc.*, 276 Ga. App. 350, 353 (623 SE2d 208) (2005) (holding that a note signed in a corporate capacity does not bind signatories individually).

[22] *See Porter Coatings v. Stein Steel,* 157 Ga. App. 260, 262 (3) (277 SE2d 272) (1981) ("No construction is required or even permissible when the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation. In such instances, the language used must be afforded its literal meaning and plain ordinary words given their usual significance.").

In reaching this conclusion, we acknowledge that for the PC to guarantee its own obligations does not appear to be particularly meaningful to either Citrus or the PC,[23] absent a future assignment of the Lease—which would then, perhaps, provide Citrus with a certain degree of belt-and-suspenders assurance that the PC remains liable for any and all obligations under the Lease. But regardless of whether the Guaranty actually provides Citrus with any tangible benefits, we are not at liberty to rewrite the parties' instrument or ignore the clear import of Owens explicitly signing the Guaranty on behalf of the PC.[24] Just as we do not give a guarantor a pass when he fails to read the guaranty before signing it,[25] we likewise will not save a creditor from

---

[23] *See, e. g., NW Parkway, LLC v. Lemser*, 309 Ga. App. 172, 176 (2) (709 SE2d 858) (2011) (noting the cardinal rule that "a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms" (punctuation omitted)).

[24] *See PlayNation Play Systems, Inc. v. Jackson*, 312 Ga. App. 340, 342 (718 SE2d 568) (2011) (refusing to "extend a guarantor's liability by implication or interpretation—an act forbidden to the courts."); *see generally Coffee Sys. of Atlanta v. Fox*, 227 Ga. 602, 602 (182 SE2d 109) (1971) (finding that "[c]ourts do not make contracts for the parties").

[25] *See Caves*, 264 Ga. App. at 112 (holding that guarantor's "failure to read the guaranty carefully and inform himself about his obligations . . . cannot discharge him from liability."); *Fore v. Parnell-Martin Cos.*, 192 Ga. App. 851, 852 (1) (386 SE2d 723) (1989) ("It is the duty of contracting parties to inform themselves with reference to the subject matter about which they desire to contract; if they fail to do so and a mistake is made owing to their own ignorance and failure to inform themselves, then

11

the consequences resulting from its failure to carefully inspect the guaranty to ensure that the proper "personal capacity" designations and signatures have been made. To be sure, this Court has previously suggested in dicta that a corporate guarantee of corporate debt is all but meaningless, and that this fact might serve as an additional justification for imposing personal liability on a signatory to a guaranty.[26] But any inquiry into the "meaninglessness" of a corporate guaranty of corporate debt is entirely inappropriate, and indeed runs contrary to our charge to strictly construe guaranties, when a guarantor has—as in this case—explicitly signed the guaranty in

---

any injury results from their own conduct.") (punctuation omitted); OCGA § 23-2-29 ("If a party, by reasonable diligence, could have had knowledge of the truth, equity shall not grant relief; nor shall the ignorance of a fact known to the opposite party justify an interference if there has been no misplaced confidence, misrepresentation, or other fraudulent act.").

[26] *See Keane v. Annice Heygood Trevitt Support Trust*, 285 Ga. App. 155, 157 (645 SE2d 641) (2007) (noting in dicta that "if the obligation was limited to Keane in his corporate capacity, the guaranty would have been rendered meaningless as the corporation was already obligated on the debt."); *Kirves v. Juno Indus.*, 226 Ga. App. 508, 508 (487 SE2d 31) (1997) (holding that "the contract is unambiguous" and explicitly contained language personally guaranteeing the corporate debt, and noting in dicta that "[a]ny other construction of the 'Letter of Guaranty' . . . would be meaningless."); *Upshaw v. S. Wholesale Flooring Co.*, 197 Ga. App. 511, 513 (3) (398 SE2d 749) (1990) (finding that "[a]lthough appellant also relies upon her placement of the abbreviation 'Sec.' immediately after her signature, such an abbreviation is a mere word of description and the obligation incurred by appellant is personal," and noting in dicta that a finding that appellant signed a guaranty in her corporate capacity would render document meaningless).

12

a corporate capacity. As such, we take this opportunity to strongly caution trial courts against relying on any of our decisions employing such dicta as a justification for imposing personal liability on a signatory to a guaranty when the clear and unambiguous language of same indicates the exact opposite. And here, because Owens unambiguously signed the Guaranty in a corporate capacity, he was entitled to summary judgment.[27]

*Case No. A13A1122*

2. The PC contends that the trial court erred in finding that the Lease was not ambiguous and in excluding parol evidence of the parties' collateral agreements defining the terms "Imaging Center" and "functionally operational." We disagree.

The construction of a contract is a three-step analytical process. The trial court must first decide if the language is clear and unambiguous, and, if it is, no construction is required,[28] the court simply enforces the contract according to its plain

---

[27] *Compare Keane*, 285 Ga. App. at 157 (rejecting argument that guarantor signed guaranty in capacity as a shareholder because while "the guaranty references the fact that Keane is a shareholder, . . . it does not expressly provide that Keane is signing the guaranty in this capacity" and the "language employed bound Keane in his personal capacity.").

[28] *Gen. Steel, Inc. v. Delta Bldg. Sys., Inc.*, 297 Ga. App. 136, 138 (1) (676 SE2d 451) (2009).

13

terms.[29] But if the contract is ambiguous in some respect, the court must then apply the rules of contract construction to resolve that ambiguity.[30] Lastly, if the ambiguity remains after applying the rules of construction, then the meaning of the ambiguous language and the parties' intentions are issues for a jury.[31]

A contract is ambiguous if the words used therein "leave the intent of the parties in question—i.e., that intent is uncertain, unclear, or is open to various interpretations."[32] On the other hand, no ambiguity exists where, "examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation."[33]

At issue here is the meaning of the terms "Imaging Center" and "functionally operational" as set forth in the Lease provision defining the term of the Lease. Both parties agree that although the Lease was executed in December 2008, the term of the Lease did not begin at that time. But the PC contends that conditions required for the

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Coleman v. Arrington Auto Sales & Rentals*, 294 Ga. App. 247, 249 (2) (669 SE2d 414) (2008) (punctuation omitted).

[33] *Id.* (punctuation omitted).

term of the Lease to commence were never met and therefore its obligation to pay Citrus never arose. The Lease provides:

> 2. TERM. The term of this Lease shall commence on the first day that the Imaging Center is functionally operational (the "Effective Date"), and unless terminated as hereinafter provided, shall continue for a term of ten (10) years (the "Term").

Although "Imaging Center" is capitalized, the term is not defined in the Lease. However, within the context of the Lease, the Imaging Center can only refer to Citrus's facility in Clermont, Florida. For example, the Lease, in another provision, speaks of the "Imaging Center facility."[34]

Similarly, the term "functionally operational" is not defined in the Lease itself. But looking first to its plain and ordinary meaning, "functionally" is defined as "in a functional manner."[35] And "operational" is defined as "[i]n a condition of readiness

---

[34] Further, the lessor is the "Citrus Tower Boulevard Imaging Center, LLC," and the PC is afforded the right to use a medical office suite at "Citrus Tower Blvd" in Clermont.

[35] The Compact Oxford English Dictionary 649 (2d ed. 1991). *See generally Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1) (455 SE2d 601) (1995) (noting that courts may turn to a dictionary for the plain, ordinary, and popular sense of a word in interpreting contracts).

15

to perform some intended . . . function."[36] Thus, consistent with the findings of the trial court, we conclude that, viewing the Lease as a whole,[37] the Imaging Center became "functionally operational" when it was ready to perform its intended function.

Relying on Owens's affidavit, the PC maintains that Owens and Citrus's representative orally agreed as to what was required for a "functionally operational" Imaging Center. These discussions occurred both before and after the Lease was executed in December 2008. And according to Owens, the agreement between the PC and Citrus as to the elements of a "functionally operational" Imaging Center included the following:

(i) adequate patient referral flow agreements;

(ii) insurance contracts in place which would permit claims for images from the imaging center to be processed and reimbursed at rates assured by Citrus;

(iii) imaging equipment certified by ACR[38] and maintained in accordance with insurance industry standards;

---

[36] The Compact Oxford English Dictionary 1217 (2d ed. 1991).

[37] *See Archer W. Contractors Ltd. v. Estate of Mack Pitts*, 292 Ga. 219, 224 (2) (735 SE2d 772) (2012) (providing that contracts must be construed as a whole).

[38] When Owens's affidavit is read in conjunction with his deposition, it appears that "ACR" refers to the American College of Radiology.

(iv) adequately trained personnel to provide professional services to operate the imaging equipment;

(v) a fully stocked "crash cart" for patient safety; and

(vi) completion of finished space in the office building suitable for occupancy and use.

It is true, of course, that extrinsic evidence is admissible to explain an ambiguity contained within a contract.[39] On the other hand, where the terms of the contract are clear and unambiguous, "the court looks only to the contract to find the parties' intent."[40] Accordingly, the trial court correctly refused to look outside the terms of the Lease to determine when the parties intended the term of the Lease to begin. But even if we assume *arguendo* that "functionally operational" and "Imaging Center" are ambiguous terms, the evidence as to the foregoing oral agreements remains inadmissible. The detailed and complex set of conditions and duties purported to constitute a "functionally operational" Imaging Center do more than merely explain an alleged ambiguity as to the term of the Lease. They significantly

---

[39] *See* OCGA § 13-2-2 (1).

[40] *Quality Foods, Inc. v. Smithberg*, 288 Ga. App. 47, 51 (1) (653 SE2d 486) (2007).

*add* to Citrus's obligations thereunder, and it is well established that parol evidence is inadmissible to "add to, take from, vary or contradict the terms of a written instrument."[41]

Contending that the Lease is nevertheless "incomplete on its face," the PC argues that extrinsic evidence should be admitted to determine when the Lease became effective. Specifically, the PC argues that "[i]f the writing appears on its face to be an incomplete contract and if the parol evidence offered is consistent with and not contradictory of the terms of the written instrument, then the parol evidence is admissible to complete the agreement between the parties."[42] And here, the Lease is incomplete on its face to the extent that it does not specify the suite that the PC would be entitled to use at the Clermont facility. Indeed, the suite number is designated "TBD," which is apparently an abbreviation for "to be determined." But the alleged collateral oral agreements reflected in Owens's affidavit have no relevance to the identification of the suite number.

---

[41] *Preferred Risk Mut. Ins. Co. v. Jones*, 233 Ga. 423, 424 (1) (211 SE2d 720) (1975); *accord* OCGA § 13-2-2 (1); *In re Estate of Belcher*, 299 Ga. App. 432, 436 (1) (a) (682 SE2d 581) (2009).

[42] *Preferred Risk Mut. Ins. Co.*, 233 Ga. at 424-425 (1).

18

Furthermore, because the Lease was not to be performed within one year of its making, it falls squarely within the Statute of Frauds.[43] And inasmuch as the Lease was required by the Statute of Frauds to be in writing, it could not be modified by an oral agreement.[44] For all the foregoing reasons, we find that the trial court did not err in finding the Lease to be unambiguous and in excluding parol evidence of the alleged oral agreements between the parties.

3. The PC also argues that if parol evidence cannot be admitted to show Citrus's agreements in variance of the Lease, a jury could nevertheless determine that Owens's testimony showed that the Imaging Center was not "functionally operational" under the plain meaning of the contract. Therefore, the PC contends that genuine issues of material fact preclude the grant of summary judgment. Once again, we disagree.

As discussed *supra*, Owens posits in his affidavit the alleged collateral agreements as to the elements of a functionally operational Imaging Center. He then ultimately avers that "[m]any, but not all" of those elements were never provided by

---

[43] OCGA § 13-5-30 (5).

[44] *See Jaraysi v. Sebastian*, 318 Ga. App. 469, 475 (1) (c) (733 SE2d 785) (2012); *Johnson v. Ashkouti*, 193 Ga. App. 810, 810 (1) (389 SE2d 27) (1989).

19

Citrus. Indeed, Owens specifically avers that Citrus still has not (1) "put in place adequate contracts with insurance companies;" (2) "put in place the referral contracts necessary to make the imaging center functionally operational with a meaningful volume of patients;" (3) "obtained all the necessary certifications and maintenance of the magnetic resonance (MR) imaging equipment so that it may be deemed functionally operational;" and (4) "fully completed the build out of space agreed to be part of the Imaging Center." But the record shows that Owens testified during his deposition that the Clermont facility was open and "began scanning real patients . . . around October of 2010." Owens also produced numerous documents showing that the PC began practicing out of the Clairmont facility in October 2010. Moreover, MRI scans read by the PC were performed at the facility in the autumn of 2010, and Owens indicated that the PC generated revenue at the Clermont facility beginning in 2010. And records produced by Owens also showed that hundreds of MRI scans were performed at the Imaging Center beginning in the autumn of 2010. Given the undisputed facts regarding the PC's use of the Imaging Center, the trial court did not err in finding that there was no genuine issue of material fact as to whether the Imaging Center was functionally operational by December 2010, the time from which Citrus demanded rent from the PC.

20

4. The PC further asserts that the trial court erred in failing to rule on and sustain the evidentiary objections of the PC and Owens as to the affidavit of Citrus's managing member, George Overend, which was submitted in support of Citrus's motion for summary judgment. Again, we disagree.

The PC filed a motion to strike Overend's affidavit, in which he avers that the Imaging Center became operable in December 2010. And in its summary-judgment order, the trial court noted that the parties agreed at the hearing that it need not rule on the PC and Owens's objection to Overend's affidavit. The PC asserts, and Citrus does not dispute, that there was never any agreement by the parties that the trial court need not rule on the objection in the event that, as ultimately occurred, the trial court granted Citrus's motion for summary judgment. But even if Overend's affidavit had been struck, the evidence—particularly Owens's deposition testimony—still demands the grant of summary judgment to Citrus as to its claims against the PC. Accordingly, even if the trial court erred in failing to address the objection to Overend's affidavit, the error was harmless.[45]

---

[45] *See, e. g. Grot*, 317 Ga. App. at 791 (3) (reiterating that an appellant must show harm as well as error to prevail on appeal).

21

5. The PC further argues that its affirmative defense of fraud in the inducement precluded the entry of summary judgment for Citrus. Once again, we disagree.

The elements of fraud, according to the PC, were established by Owens's averment that Citrus's representative, Franklin Trell, made false representations to Owens, which Owens then relied upon in causing the PC to enter into the Lease, Guaranty, and the amendment to the Lease.[46] According to Owens, Trell falsely represented to him that Citrus secured or would secure the elements of a functionally operating Imaging Center discussed *supra*, such as adequate patient-referral-flow agreements and insurance contracts, among other things. The PC asserts that a jury could find that those representations were made with Citrus's knowledge that the statements were false or with an intent not to perform.[47]

Here, however, the PC continued to utilize the services provided by Citrus's Clermont facility even after it realized that the alleged representations were false, and

---

[46] *See Griffin v. State Bank*, 312 Ga. App. 87, 90 (1) (a) (718 SE2d 35) (2011) (noting that the elements of fraud include "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff" (punctuation omitted)).

[47] *See id.* at 91 (1) (a) (noting that "claims of fraud arising from a representation of a future event made with knowledge that it is false or intention not to perform may be actionable" (punctuation omitted)).

22

it opted not to formally rescind the Lease even, according to Owens, "with the lawsuit coming on." And as we have previously explained, "[i]t is incumbent upon a party who attempts to rescind a contract for fraud to repudiate it promptly on discovery of the fraud."[48] Thus, inasmuch as the PC did not rescind the Lease, it was bound by the terms contained therein.[49] In addition, the Lease contained a merger clause, which provided that the "Lease constitutes the entire agreement between the parties hereto . . . and there are no other agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth herein . . . ." Accordingly, the PC is precluded from relying on representations that were not part of the contract.[50] And as fraud requires a showing of justifiable reliance (evidence of

---

[48] *Browning v. Powell*, 165 Ga. App. 315, 317 (2) (301 SE2d 52) (1983) (punctuation omitted).

[49] *See Novare Group, Inc. v. Sarif*, 290 Ga. 186, 190 (3) (718 SE2d 304) (2011).

[50] *See First Data POS, Inc. v. Willis*, 273 Ga. 792, 794-795 (2) (546 SE2d 781 (2001) (holding that "in an arm's length business transaction, pre-contractual representations are superceded by a valid contractual merger clause, and cannot form the basis of post-contractual claims of theft by deception, fraud, or misrepresentation").

which is lacking here), the PC simply cannot establish that it was fraudulently induced into entering into the Lease and shows no grounds for reversal.[51]

6. Lastly, PC contends that the trial court erred in granting summary judgment to Citrus because there was a genuine issue of material fact as to its affirmative defense of lack of consideration.[52] Once again, we disagree.

The PC contends that there was a failure of consideration because Citrus never provided it with a functionally operational Imaging Center. But, as discussed *supra*, the evidence shows that Citrus did provide PC with a functionally operational Imaging Center. It follows, then, that there is no genuine issues of material fact remaining as to the PC's claim of a failure of consideration.

*Judgments affirmed. Andrews, P. J., and McMillian, J., concur.*

---

[51] *See Novare Group*, 290 Ga. at 190 (3).

[52] *See* OCGA §§ 13-3-40 (a) (consideration is essential to an enforceable contract); 13-5-9 (total or partial failure of consideration may be pleaded as a defense to enforcement of a promise); *Han v. Han*, 295 Ga. App. 1, 4 (2) (670 SE2d 842) (2008) (same).