**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**RAY and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 16, 2018**

# In the Court of Appeals of Georgia

A18A1348. BOWERS v. TODAY'S BANK

RAY, Judge.

Peter M. Bowers ("Guarantor") appeals from a trial court order granting summary judgment to Today's Bank (f/k/a First State Bank of Northwest Arkansas), denying summary judgment to him, and finding him personally liable as guarantor on a $4.96 million loan. Guarantor contends, inter alia, that the trial court erred in holding that he became personally liable as guarantor when the property securing the loan became an asset in a receivership proceeding . For the following reasons, we reverse.

"We review the denial or grant of summary judgment de novo to determine whether there exists a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a

matter of law." (Citation omitted.) *American Strategic Ins. Corp. v. Helm*, 327 Ga. App. 482, 483 (759 SE2d 563) (2014). "Contract construction is a question of law for the court that is subject to de novo review." (Citation and punctuation omitted.) *Albritton v. Kopp*, 300 Ga. 529, 531 (796 SE2d 676) (2017).

The record shows that in 2006, GMAC Commercial Mortgage Bank ("GMAC") made a $4.96 million loan to River I, LLC and River II, LLC (collectively "Borrower") to finance the acquisition of a shopping center located in Clayton County, Georgia. The loan was secured by the shopping center and other property. Guarantor and his wife also invested approximately $1.44 million of their own funds in the acquisition of the shopping center.

The loan was nonrecourse, with limited exceptions. Section 12.01 of the loan agreement provides, in pertinent part,

> 12.01 *Nonrecourse Obligation.* Except as otherwise provided in this Article 12 . . . Lender shall enforce the liability of Borrower . . . only against the Property and other collateral given by Borrower as security for payment of the Loan . . . and not against Borrower or any of Borrower's principals, directors, officers or employees.

Sections 12.02 and 12.03 of the loan agreement provided exceptions to the nonrecourse provision in section 12.01. Under section 12.02, the loan becomes fully

recourse against Borrower under specific circumstances. Section 12.02 provides, in pertinent part:

> 12.02 *Full Personal Liability*. Section 12.01 above shall BECOME NULL AND VOID and the Loan FULLY RECOURSE to Borrower if: (a) the Property or any part thereof becomes an asset in a voluntary bankruptcy or other insolvency proceeding; (b) Borrower . . . commences a bankruptcy or other insolvency proceeding; (c) an involuntary bankruptcy or other insolvency proceeding is commenced against Borrower . . . (by a party other than Lender) but only if Borrower . . . has failed to use best efforts to dismiss such proceeding or has consented to such proceeding[.]

As a condition of making the loan, GMAC required Guarantor, who owned an indirect interest in Borrower, to execute a guaranty. In section 2.01 of the guaranty, Guarantor guaranteed "all obligations and liabilities of Borrower for which Borrower is, or shall become, personally liable pursuant to the Loan Agreement and other Loan Documents, as and to the extent provided in Section 12.02 and Section 12.03 of the Loan Agreement."

Shortly after the loan closed, GMAC assigned the loan to Wells Fargo Bank, N.A., as trustee for the registered Holders of Credit Suisse First Boston Mortgage

3

Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-C1 ("Wells Fargo").

When Borrower acquired the shopping center in 2006, Wayfield Foods was the anchor tenant. By 2007, the economy severely and negatively affected the leasing market in the area where the shopping center was located. In 2010, Guarantor began efforts to convince Wayfield Foods to extend the lease, which was set to expire on July 31, 2012. Guarantor also began efforts to find a replacement tenant.

After Wayfield Foods notified Borrower that it was not going to renew the lease, Guarantor notified Wells Fargo's loan servicer verbally and in writing that Wayfield Foods had elected not to renew its lease and that Borrower had been unable to find a replacement tenant. In a memorandum dated September 30, 2011, Guarantor acknowledged that cash flow would not be sufficient to cover the payments on the loan after Wayfield Foods left the shopping center if no replacement anchor tenant was found.

Guarantor stated in the memorandum that, with no prospect of finding another anchor tenant, he considered his investment in the shopping center to be lost and that he could not afford to put anything further into the property. Guarantor expressed his

belief that it would be in Wells Fargo's best interests to assume control of the shopping center.

Shortly thereafter, Wells Fargo assumed control of rental payments received from tenants and made loan payments on Borrower's behalf. Borrower continued to operate the shopping center. Borrower paid all operational expenses with its own funds and received reimbursement from Wells Fargo.

The asset manager for Wells Fargo's loan servicer was responsible for recommending a course of action to Wells Fargo. The asset manager recommended that Wells Fargo seek the appointment of a receiver to take possession of the shopping center with the authority to market the available space for lease, and, if necessary, market the shopping center for sale. Wells Fargo approved the asset manager's recommendation. Wells Fargo's attorney informed Borrower's attorney that Wells Fargo planned to file a petition for the appointment of a receiver. Wells Fargo's attorney expressed confidence that the court would grant Wells Fargo's request for a receiver. However, he requested Borrower's consent to a proposed order appointing a receiver so the process would go more quickly. Borrower's attorney, acting on Borrower's behalf, signed the consent order. Wells Fargo filed the receivership proceeding against Borrower on January 20, 2012.

When the receivership proceeding was filed, Borrower surrendered the shopping center to the receiver as required by the consent order. The receiver had not found a replacement anchor tenant by the time Wayfield Foods vacated the shopping center on July 31, 2012. On August 16, 2012, Wells Fargo sent Borrower and Guarantor a notice of default for failure to make payments when due. In 2013, Wells Fargo sold the loan at auction to Today's Bank.

1. Guarantor contends that the trial court erred in holding that he became personally liable as guarantor when the shopping center became an asset in the receivership proceeding filed by Wells Fargo. We agree.

"The cardinal rule of [contract] construction is to ascertain the intention of the parties." OCGA § 13-2-3. The construction of a contract

> involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

6

(Citation omitted.) *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 30 (3) (743 SE2d 381) (2013).

> A contract is ambiguous if the words used therein leave the intent of the parties in question - i.e., that intent is uncertain, unclear, or is open to various interpretations. On the other hand, no ambiguity exists where, examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation.

(Citations and punctuation omitted.) *Citrus Tower Boulevard Imaging Center, LLC v. Owens*, 325 Ga. App. 1, 8 (2) (752 SE2d 74) (2013). A contract "must be read reasonably, in its entirety, and in a way that does not lead to an absurd result." *Office Depot, Inc. v. District at Howell Mill, LLC*, 309 Ga. App. 525, 530 (2) (710 SE2d 685) (2011).

Section 12.01 of the loan agreement provides that, with limited exceptions, the loan is nonrecourse. Section 12.02 lists the events that will trigger full personal liability to Borrower. Section 12.02 (a) provides that the loan becomes fully recourse to Borrower if "the Property or any part thereof becomes an asset in a voluntary bankruptcy or other insolvency proceeding." Under section 2.01 of the guaranty, Guarantor is liable if Borrower is personally liable under section 12.02 of the loan

7

agreement. Today's Bank argues that Borrower became personally liable under section 12.02 (a) of the loan agreement and, thus, Guarantor became liable under the guaranty, when the shopping center became the subject of the receivership proceeding.

The parties agree that a receivership proceeding is an insolvency proceeding. However, Guarantor argues that the word "voluntary" in section 12.02 (a) of the loan agreement relates to both "bankruptcy" and "insolvency proceeding," so the involuntary receivership proceeding filed by Wells Fargo against Borrower did not trigger personal liability on the part of Borrower and, thus, did not trigger his obligations under the guaranty. Today's Bank contends that "voluntary" relates only to "bankruptcy," such that Borrower would become personally liable if the shopping center became an asset of any insolvency proceeding, regardless of whether it is voluntary. Today's Bank argues that section 12.02 (a) of the loan agreement was intended to apply to any receivership proceeding brought by the lender.

We must first determine whether the language of section 12.02 (a) of the loan agreement is ambiguous. See *City of Baldwin v. Woodard & Curran, Inc.*, supra at 30 (3). If section 12.02 (a) of the loan agreement is capable of only one reasonable interpretation when we examine the contract as a whole, no ambiguity exists. See

8

*Citrus Tower Boulevard Imaging Center, LLC v. Owens*, supra at 8 (2). Only if we find that there is more than one reasonable interpretation, and that section 12.02 (a) is therefore ambiguous, do we apply the rules of contract construction to resolve the ambiguity. See *City of Baldwin v. Woodard & Curran, Inc.*, supra at 30 (3).

Sections 12.02 (a) and (c) of the loan agreement are parallel in structure. Subsection (a) uses the phrase "voluntary bankruptcy or other insolvency proceeding." Subsection (c) uses the phrase "involuntary bankruptcy or other insolvency proceeding." In subsection (c), "involuntary" clearly relates to both "bankruptcy" and "insolvency proceeding" because subsection (c) also includes the language "is commenced against Borrower." The parallel structure of subsections (a) and (c) strongly suggests that "voluntary" relates to both "bankruptcy" and "insolvency proceeding" in subsection (a).

Reading the loan agreement in its entirety, it is clear that the intent of the parties was for the loan to be nonrecourse, with certain limited exceptions. Sections 12.02 (b) and (c) of the loan agreement address ways in which Borrower could deprive the lender of the benefit of its security by interposing other creditors ahead of the lender. Under those circumstances, sections 12.02 (b) and (c) of the loan agreement give the lender full recourse against Borrower, and, by way of the

9

guaranty, the Guarantor. However, a receivership proceeding filed by the lender is not like the situations addressed in sections 12.02 (b) and (c) of the loan agreement. In a receivership proceeding filed by the lender, Borrower is not interposing other creditors potentially ahead of the lender. To the contrary, filing a receivership proceeding and getting a receiver appointed is a way for the lender to protect its security interest.

Today's Bank does not argue on appeal that section 12.02 (c) of the loan agreement applies in this case. However, section 12.02 (c) of the loan agreement provides context that is useful in interpreting the language of section 12.02 (a). Section 12.02 (c) specifically excludes proceedings commenced by the lender from involuntary bankruptcy or other insolvency proceedings that would impose personal liability on Borrower. It would be inconsistent to interpret section 12.02 (a) of the loan agreement to impose personal liability on Borrower because of a proceeding commenced by the lender.

Interpreting section 12.02 (a) of the loan agreement the way that Today's Bank advocates would severely undermine the nonrecourse provision in section 12.01. It would be inconsistent with the structure of the loan as nonrecourse to allow the lender to make the loan full recourse against Borrower by filing a receivership proceeding

and getting a receiver appointed. Reading section 12.02 (a) so that "voluntary" does not relate to "other insolvency proceeding" would subvert the plain intent of the parties. No ambiguity exists, because in examining the loan agreement as a whole, section 12.02 (a) is capable of only one reasonable interpretation: the word "voluntary" relates to both "bankruptcy" and "insolvency proceeding." Accordingly, an insolvency proceeding must be voluntary to trigger full recourse liability under section 12.02 (a) of the loan agreement.

Today's Bank further contends that even if this Court were to determine that an insolvency proceeding must be voluntary to trigger liability under section 12.02 (a) of the loan agreement, the receivership proceeding filed by Wells Fargo was voluntary because Borrower voluntarily agreed to the receivership proceeding. Guarantor argues that because the receivership proceeding was commenced by Wells Fargo against Borrower, it was an involuntary insolvency proceeding. We agree with Guarantor.

In the context of the loan agreement, it is clear that a voluntary insolvency proceeding is one commenced by Borrower and an involuntary insolvency proceeding is one commenced against Borrower. It would make no sense to interpret the loan agreement to put personal liability on Borrower because it cooperated with Wells

11

Fargo. Borrower's consent to the receivership order, at Wells Fargo's request, does not convert what would otherwise be an involuntary proceeding into a voluntary proceeding. Thus, Borrower and Guarantor did not become personally liable when the shopping center became an asset in the receivership proceeding filed by Wells Fargo.

2. Based on our holding in Division 1, we need not address Guarantor's remaining enumerations of error.

*Judgment reversed. McFadden, P.J., and Rickman, J., concur*.